OPINION OF THE COURT
Per Curiam.
When a Grand Jury is presented with conflicting versions of a shooting death, it may choose to indict the defendant for second degree manslaughter rather than intentional murder, provided that either charge is supported by sufficient evidence. Here, the evidence was sufficient to support either, and the Grand Jury opted for second degree manslaughter.
The evidence before the Grand Jury showed that Mrs. Eleanor Bumpurs was a 66-year-old, obese, emotionally disturbed woman who had fallen behind in her rent payments. The Housing Authority made numerous attempts to help her with her rent, but she refused aid. Her daughters were contacted, but they ignored the problem and refused to help. Furthermore, a psychiatric examination, conducted while Mrs. Bumpurs held the interviewing doctor at knifepoint, led to the conclusion that Mrs. Bumpurs needed hospitalization. Ultimately, the Housing Authority obtained a judgment of eviction against her.
Housing Authority officials judged that physically dispossessing Mrs. Bumpurs would be a dangerous proposition. In the past, those visitors to whom Mrs. Bumpurs responded at all, were greeted with a knife. She was also rumored to have thrown lye at an "intruder.” On the day the Housing Authority arrived to remove Mrs. Bumpurs from the premises, she *498 threatened to kill or hurt anyone who dared to enter. Housing Authority police, informed of Mrs. Bumpurs’ violent history, radioed for backup assistance from New York City Police. The two city police officers who responded observed Mrs. Bumpurs’ abusive reactions when Housing Authority officers attempted to gain entrance to her apartment. They decided to summon aid from an elite specialized team of city police called the Emergency Service Unit (ESU). The members of the ESU are highly trained crisis intervention officers often called to aid in dealing with emotionally disturbed persons (EDP’s). Defendant is a decorated member of the ESU with 19 years’ experience, who responded to such a call involving Mrs. Bumpurs.
Several people in the large group that had gathered outside her apartment by this time, including ESU members, attempted to soothe Mrs. Bumpurs and convince her to come out of her apartment peacefully, to no effect. Police next removed the lock on the apartment in order to ease entrance and to observe Mrs. Bumpurs. They were able to see through the broken lock that she held a large carving knife and that the apartment was filled with a smoky odiferous substance described as smelling like insecticide or boiling lye. One of the police held the door closed to prevent Mrs. Bumpurs from charging into the crowd with her knife.
The ESU members present developed a plan based on department regulations. Two officers would enter the apartment and attempt to restrain her, while a third would cover the others. A fourth officer would guard the doorway. They were considering removing the door, when the police noticed that Mrs. Bumpurs had left the doorway area with her knife. Taking advantage of Mrs. Bumpurs’ absence from the entranceway, ESU Officers Elter, Tedeschi and Adams, equipped with gas masks, burst into the apartment, while defendant, without a gas mask that would distort his view, covered them at the door with a shotgun. Officers Elter, Tedeschi and Adams held plastic protective shields and Elter had only an EDP pole, designed to encircle the disturbed person’s waist and pin her against the wall, for offensive use.
The plan went awry when Mrs. Bumpurs ran toward Elter, making hacking motions at him with her knife. The EDP pole apparently had no effect other than knocking Elter off balance. Defendant observed Elter on the floor with only a plastic shield to protect himself and Mrs. Bumpurs running toward him. At about the same time, Adams, who was attempting to *499 disarm her with his shield, also faltered and lost balance, placing himself in an equally vulnerable position with only a plastic shield.
It was at this moment that defendant stepped forward and shouted to Mrs. Bumpurs to drop the knife. When she ignored the commands he decided to shoot at Mrs. Bumpurs’ body mass to protect his fellow officers. That this shot was justified is undisputed. The department regulations instruct an officer to shoot an EDP if absolutely necessary and to shoot toward the body mass. The question to be resolved in this case involves defendant’s second shot which led to Mrs. Bumpurs’ death.
Defendant testified before the Grand Jury that the first shot did not seem to deter Mrs. Bumpurs and that she continued to approach the downed officers with her knife. Thus, he testified, a second later, he fired the second shot. While the testimony of most of the observers corroborated this account, one witness estimated that the second shot was fired as many as five seconds later.
Although both shots were aimed at Mrs. Bumpurs’ body mass, one of the shots hit her hand, removing her thumb and index finger. The other shot hit her chest. There was some medical testimony that the shot to the hand was first. Medical testimony further indicated that it would have been impossible to wield the knife after the hand wound. Thus, there was evidence that Mrs. Bumpurs was no longer threatening the officers with a knife after the first shot and that defendant had as many as five seconds to observe this changed circumstance and stop shooting.
The Grand Jury, having been instructed on the justification defense and the elements of higher homicide offenses, nonetheless indicted defendant for the crime of manslaughter in the second degree. Supreme Court dismissed the indictment on defendant’s motion, reasoning that the evidence before the Grand Jury established that defendant followed departmental procedure and that there was, therefore, no basis to find that defendant’s conduct constituted a gross deviation from the standard of conduct that a reasonable person would observe in the same situation. The Appellate Division affirmed, one Justice dissenting.
The conclusion of the courts below is erroneous and must be reversed. When the evidence is taken in the light most favorable to the People and all conflicting and exculpa *500 tory evidence is ignored (see, People v Warner-Lambert Co., 51 NY2d 295, 299), the facts could support a finding of an unnecessary shooting, after a five-second observation period, of an unarmed woman. Such conduct would support a finding of a "gross deviation from the standard of conduct that a reasonable person would observe in the situation” (Penal Law § 15.05 [3]). Thus, that evidence, " 'if unexplained and uncontradicted would warrant conviction by a trial jury’ ” (People v Di Napoli, 66 NY2d 812, 815; People v Pelchat, 62 NY2d 97, 105).
Defendant presents the question whether, on these facts, he could properly be indicted for the crime of reckless manslaughter arguing that the evidence would support a petit jury finding that "defendant was guilty of an intentional shooting or no other” (People v Wall, 29 NY2d 863, 864). We cannot agree that in the situation presented, defendant could not have been found to have acted recklessly in deciding to shoot the second time in disregard of the circumstances which may have rendered a second shot unnecessary and contrary to departmental instructions.[1] The Grand Jury could have found the second shot to have been unnecessary and that defendant was or should have been aware of that circumstance because (a) the first shot removed the threat of the weapon, (b) five seconds passed before the second shot, and (c) defendant’s vision was unobscured by a mask.[2]
Unlike a petit jury’s obligation to convict upon being convinced beyond a reasonable doubt, the Grand Jury’s authority to indict upon a showing of sufficient evidence is permissive only (GPL 190.65; 1 CJI [NY] 1.03, p 10; LaFave & Israel, Criminal Procedure, at 620, n 3; Note, Grand Jury as an Investigatory Body, 74 Harv L Rev 590). CPL 190.65 (1) pro *501 vides that "a grand jury may indict a person for an offense when * * * the evidence before it is legally sufficient to establish that such person committed such offense” (emphasis added). Consistent with centuries of history (see, People v Valles, 62 NY2d 36, 42-44 [Meyer, J., dissenting]; Kuh, Grand Jury "PresentmentFoul Blow or Fair Play?, 55 Colum L Rev 1103, 1108), CPL 190.65 allows the Grand Jury to decide that an excessively technical application of the law upon a particular defendant would work an unfairness that would be contrary to the conscience of the community (LaFave & Israel, Criminal Procedure, at 620). This power to extend lenity does not present it solely with the extreme choices of complete absolution or indictment on the top count supported by legally sufficient evidence. The Grand Jury, unlike the petit jury (People v Scarborough, 49 NY2d 364, 371; People v Discala, 45 NY2d 38, 43), is permitted to mitigate the harshness of the law by returning a true bill for only a lesser offense (LaFave & Israel, Criminal Procedure, at 620). In contrast, in the context of the petit jury, the "mercy-dispensing power is a thing apart from the true duty imposed upon a jury * * * it is, rather, an inevitable consequence of the jury system” (People v Mussenden, 308 NY 558, 562; cf. People v Tucker, 55 NY2d 1, 7-8).
It is true that, taken in the light most favorable to the People, the evidence may have been technically sufficient to support indictment of an intentional crime. But this fact would not preclude the Grand Jury from indicting defendant on the lesser included offenses of manslaughter in the second degree (Penal Law § 125.15) or criminally negligent homicide (Penal Law § 125.10; see, People v Green, 56 NY2d 427). Certainly, the Grand Jury was not obliged to accept defendant’s testimony concerning intent as a concession that he acted with the necessary culpable mental state to support a charge of murder (Penal Law § 15.05 [1]) and not the lesser included culpable mental state to support manslaughter in the second degree (Penal Law § 15.05 [3]) or the lesser included culpable mental state to support criminally negligent homicide (Penal Law § 15.05 [4]; see, People v Green, supra; People v Stanfield, 36 NY2d 467). In the context of the decision to charge lesser included offenses to the petit jury after trial, on the facts presented here — as opposed to the cases cited and hypothesized by the dissent (dissenting opn, p 509) — this defendant would be entitled to a charge of reckless manslaughter, since the evidence could support a finding that he *502 acted, in reckless disregard of the circumstances which rendered his conduct unjustified (Penal Law § 35.05).
Either party should be given a requested charge-down when, first, "it is impossible to commit the greater crime without concomitantly, by the same conduct, committing the lesser offense [and, second,] there is a reasonable view of the evidence in the particular case that would support a finding that he committed the lesser offense but not the greater” (People v Glover, 57 NY2d 61, 63; People v Green, 56 NY2d 427, 430, supra). It is settled that reckless manslaughter satisfies the first prong or impossibility test (People v Ford, 66 NY2d 428, 439; People v Green, supra, pp 433-434). The question remains whether, on these facts, there is a reasonable view of the evidence that would support a verdict of reckless manslaughter but not murder or manslaughter based upon an intentional shooting.
An indictment for murder in the second degree would depend on a Grand Jury finding of a specific design to effect death — not merely an intent to shoot (Penal Law § 125.25 [1]; People v Patterson, 39 NY2d 288, affd 432 US 197). This case presents a peculiar set of facts in which the Grand Jury may have chosen to reject the permissive inference that a defendant intends the natural consequences of his intentional acts (People v Getch, 50 NY2d 456, 465). On the contrary, it could have found that defendant was not at all intent upon killing Mrs. Bumpurs and that he was, in fact, not concerned with the likelihood that he might kill her in his mistaken belief that she still possessed a weapon, but rather he merely wanted to protect his fellow officers. The Grand Jury could have concluded that in the tension and confusion of the situation, defendant either consciously disregarded the danger to her or negligently failed to perceive it in favor of his concern with stopping her, regardless of the fact that he had five seconds to note that she no longer represented a lethal threat. Such findings could establish the elements of reckless manslaughter or criminally negligent homicide (Penal Law § 15.05 [3], [4]; §§ 125.10, 125.15; People v Licitra, 47 NY2d 554, 558, rearg denied 53 NY2d 938).[3]
*503 Accordingly, the order of the Appellate Division should be reversed and the indictment reinstated.

. Penal Law § 15.05 (3) defines "recklessly” as follows: "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation”.

. Even if there were question as to whether defendant actually perceived the risk and consciously disregarded it, this evidence before the Grand Jury could support a finding of criminally negligent homicide (Penal Law § 125.10), a lesser included offense of manslaughter in the second degree (People v Stanfield, 36 NY2d 467) — a further basis for reinstating the indictment (see, e.g., People v Valles, 62 NY2d 36; People v Montanez, 41 NY2d 53, 59).

. The Grand Jury’s failure to return a true bill for the greater offenses of murder in the second degree and manslaughter in the first degree in no way supports the conclusion that it found the shooting justified (dissenting opn, p 510, n 3). On the contrary, since the Grand Jury was instructed that justification applied to all three charges, the court should assume that the *503 Grand Jury followed instructions and, instead, did not return an indictment on the greater charges because proof of one or more of their elements was lacking.