**Ruben CAMPANERIA,
Petitioner–Appellant,**

v.

**Theodore REID, Superintendent, Fishkill
Correctional Facility, Robert Abrams,
Attorney General of the State of New
York, Respondents–Appellees.**

**No. 143, Docket 89–2031.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 21, 1989.

Decided Dec. 12, 1989.

Miguel A. Estrada (Paul K. Rowe, Wachtell, Lipton, Rosen & Katz, Henriette D. Hoffman, The Legal Aid Soc., Federal Defender Services Unit, New York City, of counsel), for petitioner-appellant.

Marc Frazier Scholl, Asst. Dist. Atty. (Robert M. Morgenthau, Dist. Atty. for New York County, Mark Dwyer, Asst. Dist. Atty., New York County, New York City, of counsel), for respondents-appellees.

Before VAN GRAAFEILAND, MESKILL and KEARSE, Circuit Judges.

MESKILL, Circuit Judge:

Petitioner Ruben Campaneria appeals from a judgment of the United States District Court for the Southern District of New York, Duffy, J., dismissing his petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254 (1982). After a jury trial in the Supreme Court of New York, Campaneria was convicted of manslaughter in the first degree, N.Y. Penal Law § 125.20 (McKinney 1987), criminal possession of a controlled substance in the third degree, N.Y. Penal Law § 220.16 (McKinney 1980 & Supp.1989), criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03 (McKinney 1980), and criminal possession of a weapon in the third and fourth degrees, N.Y. Penal Law §§ 265.02, 265.01 (McKinney 1980 & Supp. 1989). His conviction arose out of the events surrounding the killing of Juan Sanchez on January 10, 1984.

Campaneria claims that he is being held in respondent's custody unlawfully because the state trial court erred in denying his motion to suppress certain statements he made to law enforcement officials and in failing to instruct the jury on a lesser included offense. We find these claims to be without merit and affirm the judgment of the district court.

## BACKGROUND

The facts leading to the petitioner's state court conviction are for the most part undisputed. At approximately 9:40 a.m. on January 10, 1984, New York City Police Officers Wieboldt, Caponigro and Pierno received a radio call about a shooting at the Holland Hotel in Manhattan. Upon arriving at the hotel, the officers found Campaneria in the hotel lobby, bleeding from a stab wound in the back. Campaneria told the officers that he had been stabbed and that he had shot his assailant, who was now lying in the hallway on the tenth floor. Wieboldt ordered Campaneria to get on the elevator and accompanied him to the tenth floor. Wieboldt admitted on cross-examination that if Campaneria had asked or tried to leave, he would not have been permitted to do so. Wieboldt did not indi-

cate this to Campaneria, however. In the elevator, Wieboldt asked Campaneria where the gun was, and Campaneria told him that he had thrown it into a trash can in the lobby. A .22 caliber revolver was recovered later from the trash can.

When Wieboldt and Campaneria arrived at the tenth floor, they found Sanchez lying in the hallway twenty feet from the doorway to Campaneria's room. Sanchez was still bleeding from the head, but he was dead. Wieboldt asked Campaneria what had happened. Campaneria answered that he and Sanchez, whom he knew only as "Morro," had had an argument in his room over Campaneria's girlfriend and that when Sanchez tried to stab him, he shot Sanchez. Wieboldt then asked if he could go into Campaneria's room. Campaneria said he had locked his key in the room, but did not object to the officers obtaining a key from the hotel clerk. After obtaining the key, the officers found the room in disarray and a bloody knife on the floor. A search of the room also uncovered one-half ounce of cocaine, drug paraphernalia, and brass knuckles.

At about this time, the ambulance arrived, and the emergency medical services personnel began to treat Campaneria's wound. Detective Cianfrone also arrived and observed that Campaneria appeared dazed and in pain. Campaneria was placed in the ambulance, and officer Caponigro accompanied him to the hospital. On the way, Caponigro read Campaneria his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in English. Campaneria indicated that he understood the rights and that he was willing to answer questions. He said that the fight was over a girlfriend and that drugs were involved. He also said that he was in pain and occasionally lapsed into Spanish. The medical report relating to the ambulance transfer indicated that his status was "critical" but that he was "alert/observant."

At approximately 11:45 a.m. that same day, Detective Cianfrone arrived at the hospital to speak with Campaneria, who was in the intensive care unit (ICU). In response to Cianfrone's inquiry, Campaneria said that he was not ready to be interviewed, and Cianfrone agreed to return later. At about 12:15 p.m., Cianfrone returned, and Campaneria consented to an interview. Cianfrone then read Campaneria his *Miranda* rights again in English. Caponigro also was present through most of the questioning. Campaneria answered the questions in broken yet understandable English, sometimes lapsing into Spanish. He said that he had shot Sanchez after Sanchez had suddenly stabbed him in the back while they were discussing Campaneria's girlfriend. The two then struggled, and Sanchez's knife fell to the floor. Sanchez tried to run away, and Campaneria shot him. Campaneria also indicated that he was in pain during this interview.

At about 7:00 p.m. that evening, Cianfrone returned to the hospital to ask Campaneria if he felt well enough to be interviewed by Assistant District Attorney DiNatale, but found that Campaneria had just undergone surgery. Some time after 9:00 p.m. that same evening, Cianfrone and DiNatale, accompanied by a video technician with video recording equipment, visited Campaneria and asked him if he felt well enough to be interviewed. Campaneria said that he was not, and the detective and the assistant district attorney left.

They returned the next morning at 10:00 a.m. with an audio technician and audio recording equipment. Although Campaneria was still in the ICU with various tubes running into his body and had received pain medication earlier in the morning, the nurse at the ICU said Campaneria should be alert enough to be questioned. Cianfrone asked Campaneria if he wanted to talk with them, to which Campaneria responded, "No, I don't want to talk to you now, maybe come back later." DiNatale then told Campaneria that "If you want to talk to us, now is the time to do it." Campaneria then agreed to the interview. The audio tape recorder was set up, and DiNatale read Campaneria his *Miranda* rights, which Campaneria stated he understood, and began questioning him.

At this interrogation, Campaneria said that when Sanchez entered his room, Campaneria turned, and Sanchez stabbed him in the back. Campaneria then fought to protect himself, cutting his hands in the process. The knife fell to the floor. Because Sanchez tried to get Campaneria's gun, which was sitting on his bed, Campaneria grabbed the gun and fired a shot at Sanchez. Sanchez then fled the room, and Campaneria fired again as Sanchez ran into the hallway, hitting Sanchez in the head. Campaneria then told a hotel employee to call the police and threw the gun into the trash can in the lobby. Campaneria stated during the interrogation that he thought the fight was over a girlfriend. He admitted that the cocaine and drug paraphernalia in the room were his but denied that he was dealing in drugs or that the fight with Sanchez was about drugs. Towards the end of the interview, he was asked how he felt, and he responded that he felt dizzy, yet indicated a willingness to continue. He also asked for water. DiNatale said that they could not give him water because of orders from his doctor, although the record appears to indicate that DiNatale had not spoken to any doctors. Campaneria occasionally wrinkled his face during the interview, showing discomfort. His medical records show that, despite having a serious wound, Campaneria was at all times alert and oriented and that his condition was stable.

Campaneria was charged by indictment with murder in the second degree, N.Y. Penal Law § 125.25, criminal possession of a controlled substance in the third degree, N.Y. Penal Law § 220.16, and criminal possession of a weapon in the second, third and fourth degrees, N.Y. Penal Law §§ 265.03, 265.02, 265.01. Prior to trial, the state trial court held a hearing on Campaneria's motion to suppress the statements he had made to the various law enforcement officials. At that hearing, Police Officers Wieboldt, Caponigro and Pierno, Detective Cianfrone, and Assistant District Attorney DiNatale all testified. At the completion of the hearing, the trial court denied from the bench Campaneria's motion to suppress. However, the court did not make any specific factual findings on the record and did not file a written opinion.

At trial, Campaneria's statements, including the audio recording which was played for the jury, were offered into evidence against him. Campaneria testified on his own behalf through an interpreter, stating that he was twenty-three years old and had emigrated from Cuba three years earlier. He testified that Sanchez had knocked on the door and that he had let Sanchez in, leaving the door open. He turned away, and Sanchez suddenly stabbed him in the back. The two struggled, and the knife fell to the floor. Campaneria reached for his gun, which was lying on his bed at the time, because he was afraid that Sanchez would try to grab it. They continued to struggle and moved towards the open door. The two were almost out of the room when Campaneria was able to fire off a shot. The gun happened to be pointed at Sanchez's head when he fired the shot. Sanchez stumbled out the door and down the hallway and fell dead. Campaneria denied having shot Sanchez as he tried to flee and could not recall how many shots he had actually fired at Sanchez.

Campaneria explained the contradiction between his testimony and his prior statements as the result of his inability to articulate his account of the events with any precision during his interrogations and because he was not fully aware of what he was being asked. He also testified that he had asked DiNatale during the recorded interview to stop the interview because he did not understand English.

The trial court denied Campaneria's request to submit to the jury the lesser included offense of second-degree, or "reckless" manslaughter. During their deliberations, the jury had the recorded interrogation played back. The jury subsequently found Campaneria had acted under extreme emotional disturbance and convicted him of manslaughter in the first degree. It also convicted him of the cocaine and weapons charges.

Campaneria appealed his convictions, challenging the voluntariness of his statements, their admissibility under *Miranda*, and the failure to instruct on the lesser included offense. The Appellate Division affirmed the convictions, but reduced the minimum term of his indefinite prison sentence from nine years to six years. *People v. Campaneria*, 123 A.D.2d 271, 506 N.Y. S.2d 344 (1st Dep't 1986). Leave to appeal this decision to the New York Court of Appeals was denied. *People v. Campaneria*, 69 N.Y.2d 709, 504 N.E.2d 403, 512 N.Y.S.2d 1035 (1986).

Campaneria, acting *pro se*, filed a petition for a writ of habeas corpus in the federal district court. After obtaining the State's response, the district court denied the petition without a hearing. In his petition, Campaneria claimed that his confession was coerced, that his assertion of his right to remain silent was not honored, that the trial court improperly failed to charge on the lesser included offense of second-degree manslaughter, and that he was denied a fair trial because of the prosecutors' improper cross-examination and summation. The district court concluded that Campaneria's statements were voluntary and not coerced, that he had not expressed a desire to cut off the interrogation process but merely certain interrogations, that the evidence did not require an instruction on the lesser included offense of second-degree manslaughter, and that the remaining claims of error were not of federal constitutional magnitude.

## DISCUSSION

### A. *Entitlement to Evidentiary Hearing*

As an initial matter, Campaneria raises the question whether, at the very least, he should be entitled to an evidentiary hearing in the district court. The state trial court, after holding a suppression hearing, the adequacy of which Campaneria does not challenge, denied Campaneria's motion in a ruling from the bench. No express factual findings were made in the bench ruling or thereafter. Campaneria suggests that, because of the lack of express findings, a federal evidentiary hearing is necessary.

A federal court hearing a habeas petition must ordinarily afford a presumption of correctness to the factual findings of the state court. 28 U.S.C. § 2254(d). However, the presumption of correctness does not adhere in a case in which the state court has not actually resolved the merits of a factual dispute. *Ford v. Wainwright*, 477 U.S. 399, 410–11, 106 S.Ct. 2595, 2602–03, 91 L.Ed.2d 335 (1986) (plurality opinion); *United States ex rel. Lewis v. Henderson*, 520 F.2d 896, 902–03 (2d Cir.), *cert. denied*, 423 U.S. 998, 96 S.Ct. 429, 46 L.Ed.2d 373 (1975). If the state court did not provide a full and fair hearing and did not make reliable findings relating to the material facts supportable by the record, a federal evidentiary hearing is required. *Townsend v. Sain*, 372 U.S. 293, 312–13, 83 S.Ct. 745, 756–57, 9 L.Ed.2d 770 (1963). Nevertheless, even if no express findings are made by the state court, a federal court must initially assess whether the state court impliedly made findings relating to the material facts. *Id.* at 314, 83 S.Ct. at 757–58. Moreover, unless it appears otherwise from the record, the federal court may presume that the state court applied the appropriate law. *Id.* at 315, 83 S.Ct. at 758.

At Campaneria's suppression hearing, the factual disputes were minimal. The only testimony offered at the hearing was that of Assistant District Attorney DiNatale and the various police officers. The record would therefore appear to indicate that the state trial court found the testimony of these witnesses credible and made the requisite factual findings to support the conclusions necessary to deny the motion to suppress. The district court thus did not err in failing to provide Campaneria with an evidentiary hearing.

### B. *Coercion*

Campaneria claims that his inculpatory statements were made under coercive conditions in violation of his rights under the Due Process Clause. A determination as to the voluntariness of a confession requires an inquiry into all the circumstances surrounding the law enforcement

officials' conduct to ascertain whether it overcame the accused's will to resist and brought about a confession that was not freely self-determined. *Terry v. LeFevre*, 862 F.2d 409, 413 (2d Cir.1988); *Green v. Scully*, 850 F.2d 894, 901–02 (2d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988). Relevant factors that should be considered include the accused's age, his lack of education or low intelligence, the failure to give *Miranda* warnings, the length of detention, the nature of the interrogation, and any use of physical punishment. *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir.1987).

■■■ Campaneria points to several facts that he claims indicate that his statements were coerced and involuntary. He emphasizes that he was, at the time, relatively young and foreign-born, with a poor command of the English language. During the interrogations, moreover, he was suffering from a serious knife wound and was in significant pain. At the hospital, he was questioned while in the ICU with tubes running in and out of his body, occasionally complaining of dizziness. He describes the questioning as "relentless."

On the basis of these circumstances, he attempts to analogize his situation to that of the accused in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The analogy is inapt. In *Mincey*, the accused, like Campaneria, was in the ICU after surgery with various tubes inserted into his body. Unlike Campaneria, he was unable to speak because of a tube in his mouth and had to communicate by writing on pieces of paper, he had asked repeatedly that the interview be stopped until he could get a lawyer, and he was on the edge of consciousness and in fact lost consciousness several times. *Id.* at 396–401, 98 S.Ct. at 2415–18. By contrast, Campaneria, according to his medical records, was alert and awake despite his pain. On several occasions when Campaneria declined to be interviewed, the interrog-

ators left to return later. The interrogations were relatively short.

The conduct of Campaneria's questioners was not coercive or overbearing. Although he suffered pain and discomfort, it was not so severe as to render him unable to make a voluntary statement or unduly susceptible to manipulation by his interrogators. His inculpatory statements, therefore, were not the product of unconstitutional coercion.

### C. *Waiver*

■■■ Once in the custody of law enforcement officials, an accused must be informed of his constitutional rights to remain silent and to counsel, and a waiver of those rights, to be effective, must be voluntarily, knowingly and intelligently made. *Colorado v. Spring*, 479 U.S. 564, 572–73, 107 S.Ct. 851, 856–57, 93 L.Ed.2d 954 (1987); *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Campaneria argues that, because of his poor grasp of English and the confusing circumstances surrounding the questioning, he did not understand the *Miranda* warnings when they were given to him and therefore did not effectively waive his privilege against self-incrimination. We find this claim unpersuasive.

■■■■ Even though his proficiency in the English language may have been limited, it did not prevent him from making a knowing and intelligent waiver of his constitutional rights. Campaneria's native tongue is Spanish. Nonetheless, the record, and in particular the transcript of the recorded interview, reveals that, although he spoke in broken English with an accent and occasionally lapsed into Spanish, his command of English was sufficient for him to have understood the *Miranda* warnings given to him. According to his medical records, he was alert and observant during the times that the warnings were given. On each occasion that he was advised of his rights, he indicated that he understood those rights.[1]

---

**1.** In a footnote in his brief, Campaneria raises the claim that the statements he made after he left the hotel lobby with Wieboldt were made

while in police custody but before he was advised of his constitutional rights. Campaneria focuses on the fact that Wieboldt "ordered" him

### D. Invocation of Right to Remain Silent

When a suspect invokes his privilege against self-incrimination while in the custody of law enforcement officials, whether in the form of refusing to answer questions or asking that an ongoing interrogation be terminated, his request must be "scrupulously honored." *Michigan v. Mosley,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313 (1975); *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630. Campaneria claims that his request not to be questioned at the outset of the recorded interrogation was ignored in violation of his Fifth Amendment rights. Prior to that questioning, Detective Cianfrone asked Campaneria if he wanted to talk to them. Campaneria responded that he did not want to answer questions then and preferred that they return later. Assistant District Attorney DiNatale promptly told Campaneria that if he wanted to talk with them "now was the time to do it."

 Once an accused in custody unequivocally invokes the right to remain silent, interrogation must ordinarily cease. *Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627–28; *Anderson v. Smith,* 751 F.2d 96, 101–02 (2d Cir.1984). The purpose of this prophylactic rule is to counter the inherently coercive effects of custodial interrogations. *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624. The suspect, not the interrogator, is given control over "the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Mosley,* 423 U.S. at 103–04, 96 S.Ct. at 326.

 The rule, nevertheless, is not a *per se* prohibition against all further interrogation. Questioning can be resumed after fresh *Miranda* warnings are given and the right to remain silent is otherwise scru-

pulously honored, for example, by renewing the questioning only after the passage of a significant period of time and by limiting the renewed questioning to a different subject matter than the original interrogation. *See id.* at 104–07, 96 S.Ct. at 326–28. In addition, an exception to the prophylactic rule is permitted when the invocation of the right to remain silent is ambiguous or equivocal. In such instances, narrow questions are permitted for the strictly limited purpose of clarifying an ambiguous request. *Anderson,* 751 F.2d at 103; *Wilson v. Henderson,* 584 F.2d 1185, 1188 (2d Cir. 1978), *cert. denied,* 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 316 (1979); *see also Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 492–93, 83 L.Ed.2d 488 (1984) (ambiguous invocation of right to counsel).

Nothing was ambiguous or equivocal about Campaneria's statement that he did not wish to be questioned. He straightforwardly refused to talk at that time. Moreover, DiNatale's remark that "If you want to talk to us, now is the time to do it" was not aimed at resolving any ambiguity in Campaneria's statement, but rather at changing his mind. This is precisely the sort of conduct the prophylactic rule seeks to prevent.

 The State attempts to minimize the force of DiNatale's remark by arguing that Campaneria would have known that, if he had so desired, his request to terminate the interrogation would have been honored because previous requests not to be questioned had been heeded by the officials. However, an earlier respect of a suspect's right to remain silent does not alleviate the effect of a subsequent violation of that right. *Anderson,* 751 F.2d at 102–03. The State additionally points to Campaneria's reversal of his decision not to be ques-

---

into the elevator to go to the tenth floor of the hotel. Such an "order" is to be expected from an officer who needs assistance in locating a shooting victim. An accused is in "custody" when, in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave. *United States v. Guarno,* 819 F.2d 28, 31–32 (2d Cir.1987). Even though Wieboldt testified that he would not have permitted Campaneria to leave at this

point if he had attempted to, the officer's unexpressed intent is not controlling. *United States v. Mendenhall,* 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870, 1877 n. 6, 64 L.Ed.2d 497 (1980). Other than directing Campaneria to accompany them in the elevator, the officers had not physically or verbally indicated to Campaneria that he was not free to leave. Therefore, none of the statements Campaneria made in the hotel were made while in custody.

tioned as reflecting his desire to answer DiNatale's questions. But statements made in response to questions after a suspect has invoked his right to remain silent cannot be used to raise doubts about his initial invocation. *See Smith,* 469 U.S. at 96–97, 105 S.Ct. at 493–94 (invocation of right to counsel). Under the circumstances, we cannot say that Campaneria's invocation of his right to remain silent was scrupulously honored.

■ Although it was error to have admitted the recorded interrogation into evidence, we find that this error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The recorded statement was entirely cumulative. It did not contain anything that Campaneria had not already stated in his earlier unrecorded statements to Wieboldt, Caponigro, and, in particular, Cianfrone. Although a recorded confession can be impressive evidence in a criminal trial, the fact that it was a recorded statement alone does not overcome the overwhelming untainted and substantively identical evidence against Campaneria. Furthermore, our conclusion is not changed simply because the jury asked to have the recorded interrogation played back during deliberations. The evidence in the recorded statement was no different from the evidence that came in through the testimony of the police officers. We do not lightly assume that an error of constitutional magnitude such as this is harmless, *see Anderson,* 751 F.2d at 105, but to conclude otherwise on this record would effectively preclude any error relating to a recorded, as opposed to an unrecorded, confession from being considered harmless. Such a result would be inappropriate. *Cf. Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728–29, 23 L.Ed.2d 284 (1969) (in light of overwhelming evidence of guilt, reversal of conviction would have meant no violation of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), could be harmless error).

### E. *Lesser Included Offense*

Campaneria maintains that the state trial court erred in not instructing the jury on the lesser included offense of second-degree manslaughter. The Supreme Court has held that, at least in capital cases, due process requires that the jury be instructed on any lesser included offenses when the evidence warrants such an instruction. *Beck v. Alabama,* 447 U.S. 625, 637–38, 100 S.Ct. 2382, 2389–91, 65 L.Ed.2d 392 (1980). We have yet to decide whether due process requires the same result in the non-capital context, and other circuits have split on the issue. *See Rice v. Hoke,* 846 F.2d 160, 164–65 (2d Cir.1988) (reviewing cases). We need not resolve that issue in this case, however, because Campaneria was not entitled to an instruction on second-degree manslaughter.

A jury should be instructed on lesser included offenses when "(1) it is theoretically impossible to commit the greater crime without committing the lesser and (2) a reasonable view of the evidence would permit the jury to find that the defendant had committed the lesser, but not the greater, offense." *Id.* at 165. Under New York law, second-degree manslaughter—recklessly causing the death of another, N.Y.Penal Law § 125.15(1) (McKinney 1987)—is a lesser included offense of murder in the second degree. *People v. Sullivan,* 68 N.Y.2d 495, 501–02, 503 N.E.2d 74, 78, 510 N.Y.S.2d 518, 522 (1986). Campaneria argues that, although he admittedly intended to shoot Sanchez, he did not intend to kill him. Instead, Campaneria posits, a reasonable view of the evidence could support the finding that the killing was an act of recklessness.

■ According to his own testimony, Campaneria shot at Sanchez intentionally. An intentional shooting, even absent the specific intent to kill required for murder in the second degree, is not mere recklessness. An intent to shoot another is, by its nature, an intent to cause another serious physical injury. Under New York law, causing the death of a person while intending to cause serious physical injury constitutes manslaughter in the first degree,

N.Y.Penal Law § 125.20(1); *People v. Ramirez,* 76 A.D.2d 115, 117–18, 430 N.Y.S.2d 83, 85 (1st Dep't 1980), the crime for which Campaneria was convicted. Because Campaneria admitted that he shot at Sanchez intentionally, no reasonable view of the evidence can support Campaneria's claim that he was entitled to an instruction on the lesser included offense of second-degree manslaughter.

### CONCLUSION

The judgment of the district court dismissing the petition for a writ of habeas corpus is affirmed.

KEARSE, Circuit Judge, dissenting:

I respectfully dissent from so much of the majority's decision as concludes that the improper admission in evidence of the tape recorded interrogation, conducted in violation of petitioner Ruben Campaneria's constitutional rights, *see Michigan v. Mosley,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313 (1975); *Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966), was harmless error.

In order to disregard an error of constitutional dimension, we must be convinced that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). In *Chapman,* the Supreme Court noted that an error in admitting evidence that was plainly relevant "cannot ... be conceived of as harmless" if it "possibly influenced the jury adversely." *Id.* at 23–24, 87 S.Ct. at 828. When a statement taken in violation of the defendant's *Miranda* rights has been admitted in evidence, the burden is on the prosecution to show beyond a reasonable doubt that "there is no 'reasonable possibility that the evidence complained of might have contributed to the conviction.'" *United States v. Gotay,* 844 F.2d 971, 977 (2d Cir.1988) (quoting *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828).

The State of New York did not meet its burden in this case; it did not even try. Its brief to this Court contains no semblance of any suggestion that Campaneria's manslaughter conviction is sustainable on a harmless error basis. Likewise at oral argument, even after an extended colloquy between Campaneria's attorney and the Court on this subject during which counsel pointed out that the State had not argued harmless error, the State still did not take the position that any error was harmless.

The State's silence on this issue is understandable since the trial record reveals such a highlighting of the tape recording as to make the harmless error argument untenable. In the State's opening statement, the prosecutor stated that he would prove Campaneria's guilt by Campaneria's own words; he referred generally to both the taped interrogation and the earlier unrecorded statements. In his summation, however, he barely mentioned the unrecorded interviews that were properly admitted, undoubtedly because, notwithstanding the majority's view that the taped statements were "substantively identical" to the unrecorded statements, the impression conveyed by the tape was potentially far more damning. Whereas the officers testified to the unrecorded statements in which Campaneria suggested that after Sanchez (a/k/a "Morro") stabbed him, he chased Sanchez into the hall and shot him in the heat of battle from a distance of two feet or five feet, the taped description of the shooting—which consisted almost entirely of one-word affirmative answers to leading questions from the assistant district attorney—stated repeatedly that Sanchez "was running away from the room" and was "still" running down the hall when Campaneria "stepped out of the room" and shot him from a distance of 20 feet. Given the difference in flavor, it is perhaps not surprising that in his summation the prosecutor thought it more telling to emphasize the tape.

And emphasize it he did. The prosecutor began his summation by reminding the jury of his opening statement that guilt would be proven "from the defendant's very mouth." In the rest of his summation, which covered only some 14 transcribed pages, he directed the jury's attention to

the tape at least a dozen times. For example, he stated that Campaneria's trial testimony should be rejected because Campaneria was "faced with a statement he cannot take back—why? Because it's on the tape . . . ." Again, the prosecutor argued:

> Now he starts shooting, according to the statement in the tape. He chases Morro after Morro tried to run away. He said he killed him.

> I won't play the tape for you because I played it for you this morning. Was he in imminent fear of deadly force? Meaning the defendant, at the point the knife is behind him. Sanchez is running away. He's got this gun in his hand. He follows him outside the door, on the statement, on the tape—

And again: "on the tape he said he shot the deceased in the head." And again:

> If you have any doubts of what I am saying, and being correct, I played the tape once this morning. I was going to play it again but I think that you heard it clearly this morning.

The prosecutor advised the jury that it had the option of asking to listen to the tape again.

The jury did ask to hear the tape again during its deliberations. And though it also asked for certain other items of evidence, the record does not show any request for a rereading of the testimony of the police officers. Insofar as Campaneria's statements were concerned, the jury asked only for the inadmissible tape.

When the improperly admitted evidence has been incessantly emphasized by the prosecutor in his summation and has been repeated for the jury pursuant to its express request during its deliberations, I do not believe we can reasonably conclude that there is "no 'reasonable possibility that the evidence complained of might have contributed to the conviction.'"

I would reverse the decision of the district court denying the petition for habeas corpus.