UNITED STATES of America

v.

**Miguel Angel GOMEZ, a/k/a "Pedro Medero," and Pedro Montana, a/k/a "Pedro Sabogal," Defendants.**

**No. 90 Cr. 0354 (KTD).**

United States District Court,
S.D. New York.

Jan. 3, 1991.

---

**146**

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Jonathan Rosenberg, Asst. U.S. Atty., of counsel), for U.S.

Peter R. Willis, Jersey City, N.J. (Wanda Molina, of counsel), for defendant Miguel Angel Gomez.

Daniel Nobel, New York City, for defendant Pedro Montana.

OPINION

KEVIN THOMAS DUFFY, District Judge.

Defendants Miguel Angel Gomez, a/k/a "Pedro Medero" and Pedro Montana a/k/a "Pedro Sabogal" were arrested on May 21, 1990 in the vicinity of 2170 Broadway, New

York, New York, by agents of the Drug Enforcement Administration ("DEA") and the United States Customs Service ("USCS"). Montana and Gomez were charged with having conspired to import a quantity of cocaine into the United States in violation of 21 U.S.C. §§ 812, 952(a), 960(a)(1), and (a)(2); 18 U.S.C. § 2 (1988). Gomez moves pursuant to Fed.R.Crim.P. 12(b) and 14 to suppress certain evidence, or in the alternative, to redact certain portions of evidence, and/or sever his case from that against his co-defendant Montana. The government consents to redact Gomez' name from inculpating statements made by Montana. *See* Rosenberg Letter, November 6, 1990. Montana moves to suppress statements and property as fruit of the poisonous tree because: (1) there was no probable cause to arrest; (2) statements were coerced; (3) interrogation continued in contravention of fifth amendment rights; and (4) excessive prearraignment delay preceded the making of certain statements. This motion was made solely on counsel's affidavit. A hearing on this matter was conducted before me on November 19–20, 1990, after which I reserved judgment. I accepted Montana's affidavit submitted in support of his motion at the time of the hearing. The following constitutes my findings of fact and conclusions of law.

## FACTS

The investigation which led to this arrest began on May 17, 1990 after USCS agents in Miami intercepted a package containing cocaine en route from Medellín Colombia to New York. Hearing Minutes ("H.") 3, 26. A Miami DEA agent flew to New York with the package and turned it over to Robert Koval, a New York DEA agent. H. 4. Koval examined, probed, and field tested its contents, which tested positive for cocaine. Following the testing, DEA agents in New York kept the package under surveillance. H. 26–30. The package was addressed to "Pedro Medero" at Mail Boxes, Etc., one of a private chain of businesses that, *inter alia*, rents mailbox space. H. 3, 6–7. The Mail Boxes, Etc. involved here is located at 2170 Broadway in Manhattan. Gomez apparently leased a box under the name Pedro Medero and listed a nonexistent address as his residence. H. 3, 7.

Medero called Mail Boxes, Etc. several times on May 17–19, 1990, inquiring about the whereabouts of the package. H. 8. On the morning of May 21, 1990, when Medero called Mail Boxes, Etc., he was told that the package had arrived. H. 9. Anticipating his arrival to retrieve the package, the DEA arranged a controlled delivery through employees of Mail Boxes, Etc. H. 9.

At approximately 11:35 on the morning of May 21, 1990, Gomez and Montana were seen by DEA agents walking south on Broadway in the direction of Mail Boxes, Etc. H. 9–11. When they reached Mail Boxes, Etc., Gomez entered the storefront and Montana remained outside on the sidewalk in front of the store. H. 11. While Gomez was inside Mail Boxes, Etc., Montana walked up and down Broadway between 76th and 77th streets, looking inside storefronts and cars. One of the cars that he peered into was a Mercedes Benz with smoked glass windows. That car was being used by the DEA agents staking out the location and awaiting a prearranged arrest signal.

The arrest signal was given. Upon opening the package at the counter area of Mail Boxes, Etc., Gomez was seized by DEA agent Robert Koval. H. 11. Montana was seized and frisked outside the premises, then both Gomez and Montana were arrested. H. 11, 79–83. Certain articles were recovered from Montana but no charges arose from that search. Gomez and Montana were read their *Miranda* rights. H. 11–12, 48, 140, 142–43. Montana nodded his head up and down in response to the reading and then remained silent. H. 119–20. Both were then taken to DEA offices on West 57th street for processing. H. 11–12, 48, 140, 142–43. The agents apparently told Gomez and Montana that they could help themselves by cooperating. H. 16. Montana allegedly asked who was going to take care of his family. H. 16. One of the agents responded by stating that Montana should have thought of that earli-

er. H. 16. Then, another agent stated: "I think what they meant is who is going to protect their family." H. 17. Gomez and Montana then allegedly nodded in assent. H. 17, 145.

During the interview process at DEA offices, the agents learned that Montana was on parole under the name Pedro Sabogal. H. 99. Processing concluded at the DEA's offices at approximately 2:30 p.m., then Gomez and Montana were transported to pretrial services at the United States District Courthouse for the Southern District of New York. H. 50, 100. Gomez was arraigned at approximately 5:30 p.m. on May 21, 1990. Montana was set to be arraigned but because the Magistrate's calendar was running late, his arraignment was rescheduled for the next morning. While inside the arraigning Magistrate's courtroom, Montana stated to DEA agent Peter Mitesser: "you know, I can't believe I'm in all this trouble for $50.00." H. 103–25. He further made statements to the effect that he should not have gone to pick-up the package at that time because he "smelled the cops." H. 105.

## DISCUSSION

### A. *Defendant Gomez*

▮ Gomez moves pursuant to *United States v. Bruton*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and Fed.R. Evid. 403, for: (1) suppression of Montana's post-arrest statement naming Gomez; (2) redaction of the statement to delete any reference to Gomez; or (3) a severance. The Government consents to the redaction of Montana's post-arrest statement to remove Gomez' name. It is well-settled that where a defendant makes a statement incriminating both himself and his co-defendant, admission of a redacted version of the statement which excludes the name of the co-defendant is proper and does not violate the co-defendant's constitutional rights. *United States v. Tutino*, 883 F.2d 1125, 1135 (2d Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). Because the Government agrees to redact Gomez' name from Montana's post-arrest statements, suppression of entire statements is unnecessary and a severance is unwarranted.

### B. *Defendant Montana*

Montana seeks to suppress his post-arrest statements and the items seized from him at the time of his arrest on the following grounds: (1) the arrest was not based on probable cause; (2) statements were made as a result of coercion; (3) statements were made as a result of interrogation after invocation of fifth amendment rights; and (4) statements were the result of excessive pre-arraignment delay.

#### i. Probable Cause

▮ Absent a warrant, probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to convince a person of reasonable caution that an offense has been committed by the person to be arrested. *Calamia v. New York*, 879 F.2d 1025, 1032 (2d Cir.1989) (citing *Illinois v. Gates*, 462 U.S. 213, 241–46, 103 S.Ct. 2317, 2333–36, 76 L.Ed.2d 527 (1983)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *United States v. Cruz*, 834 F.2d 47, 50–51 (2d Cir.) (citations omitted), *cert. denied,* 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1987).

Whether probable cause to arrest exists is often predicated on inherently reliable information, the collective knowledge of several officers or agents engaged in surveillance activities. Inevitably, the officers surveilling the situation are best able to appraise events in order to determine whether it is more likely than not that an offense is being or is about to be committed. As is the case here, the collective knowledge of several agents substantiated the decision to arrest Montana. Several agents in constant communication have the benefit of viewing a situation from different angles. *See Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (totality of circumstances analysis applies when making probable cause determinations). "Furthermore, a suspect's ac-

tions that suggest 'a consciousness of wrongdoing' can contribute to a finding of probable cause." *United States v. Cruz*, 834 F.2d at 51.

Montana contends that at the time of his arrest, the police knew only that he was with Gomez. I disagree. On May 21, 1990, the day that contraband was due to be picked up, Montana was walking with Gomez toward 2170 Broadway, the direction of Mail Boxes, Etc. That was the same day that "Pedro Medero" called Mail Boxes, Etc. and learned that the package, which was known to contain cocaine and was the object of surveillance, had arrived. Montana was accompanying Gomez by virtue of their having been engaged in constant conversation. Deliberately remaining outside the storefront, Montana awaited Gomez' retrieval of the package and acted as a look-out, pacing the sidewalk and peering into cars and windows. *See e.g., United States v. Patrick*, 899 F.2d 169 (2d Cir. 1990) (sufficient indicia of probable cause to predicate arrest was found with respect to a travelling companion who merely was seen walking with someone who carried the contraband). Montana was obviously accompanying Gomez who constructively possessed the cocaine housed at Mail Boxes, Etc. Although Broadway is a busy shopping area in the vicinity of Mail Boxes, Etc., the officers had amassed sufficient factors to predicate a belief that Montana was not merely window shopping but that he accompanied Gomez for the purpose of acting as lookout until the package was safely retrieved.

Viewing the circumstances in total, I find that the agents made a fair assessment, i.e., that Montana was not gazing at attractive window displays but was acting as lookout for Gomez, who was obviously at the location to retrieve contraband. Montana's conduct, as viewed under the circumstances by trained law enforcement agents, evinced a consciousness of guilt and a desire to detect the presence of surveillance. The fact that there may also have been an innocent explanation for Montana's conduct does not affect the probable cause determination. *See United States v. Price*, 599 F.2d 494, 502 (2d Cir.1979) (it is "rare indeed that an officer observes behavior consistent only with guilt and incapable of innocent interpretation"). Therefore, there was sufficient probable cause to arrest Montana.

ii. Statements as a Result of Coercion

Montana contends that his post-arrest statements on May 21 and 22, 1990 were not voluntary, and were the result of coercion. Montana contends that he was never advised of his *Miranda* rights, he was subject to verbal and physical abuse by the interviewing agents, and that the agents repeatedly told him that he could help himself by cooperating.

> Voluntariness is to be determined by viewing the totality of the circumstances and assessing whether "the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined....' " ... The factors to be considered include "the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation."

*United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir.1989) (citations omitted), *cert. denied*, — U.S. ——, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990).

Among the factors that may be considered by the Court in determining whether the defendant's will was overborne is the defendant's "familiarity with the criminal justice system." *Green v. Scully*, 850 F.2d 894, 902 (2d Cir.), *cert. denied*, 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988). An arrest record indicates familiarity with the criminal justice system. In the case at bar, the Government offered into evidence Montana's "NYSID" or rap sheet from New York State. Montana was arrested at least three times and convicted twice since 1988. When he was arrested on May 21, 1990, he was on parole following a conviction for criminal sale of a controlled substance. Gov't Exh. 1001. Thus, his familiarity with the criminal justice system at the time of his latest arrest was self evident.

Another factor the Court may consider in determining the voluntariness of the defendant's confession is the place where the interrogation was held. *Id.* In this case, Montana made several impromptu statements while awaiting arraignment. That he was not arraigned until the next day has no bearing on the spontaneity of the statements and thus has no preclusive effect. The statements were not the result of an interview conducted in the close quarters of an interrogation room, or in any coercive environment. *Compare Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416–17, 57 L.Ed.2d 290 (1978) (interrogation held while defendant was incapacitated in hospital's intensive care unit). Several statements were made in the Magistrate's courtroom on the evening of May 21, 1990 while Montana awaited arraignment. Although Montana alleges that the arresting agents had acted coercively earlier in the day, i.e., by placing him in a cell and grabbing the back of his neck when they were transporting him from place to place, there is no allegation of any coercion at the time that Montana spontaneously offered his first post-arrest statement. Neither is there a causal connection between the alleged coercion and the making of the statement. *See Colorado v. Connelly,* 479 U.S. 157, 165, 107 S.Ct. 515, 520–21, 93 L.Ed.2d 473 (1986) (confession should only be suppressed if the Court finds that such coercive measures were causally related to the confession.) At the point that Montana had made certain post-arrest statements, he had already been interviewed by pretrial services and was not in close proximity to or in an interrogation room with the agents who were purported to have strongarmed him earlier.

Moreover, Montana's allegations about the representation made by the arresting agents concerning the benefit of cooperating are unavailing. There is no coercive connotation to be gleaned by an interviewing agent telling an arrested defendant that he can help himself by cooperating. *See United States v. Guarno,* 819 F.2d 28, 31 (2d Cir.1987) (statements are not involuntary merely because the suspect was promised leniency as long as the circumstances do not otherwise suggest coercion). "It is not improper to mention the situation which the defendant faced and the advantages to him if he assisted the government." *United States v. Alvarado,* 882 F.2d at 650 (quoting *United States v. Pomares,* 499 F.2d 1220, 1222 (2d Cir.), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974)). Even outright promises of assistance are not unconstitutionally coercive if they did not overbear the defendant's free will.

I find that at the time the statements were made they were uncoerced and the natural result of conversation initiated by Montana. Any overbearance that may have existed before that time was lifted and any statements he made were volunteered free from any pressure whatsoever. When Montana made the statements, he was apparently relaxed and was under no psychological strain, or pressure to speak.

Finally, the Court may consider the amount of time the defendant was in custody prior to making the post-arrest statement. *See United States v. Arango–Correa,* 851 F.2d 54, 57 (2d Cir.1988) (five-hour detention did not render defendant's consent to search involuntary). The record before me indicates that Montana was actually in detention well under five hours. For the majority of the time, on May 21, 1990, Montana was not being interrogated, rather, he was subject to routine processing by the DEA, and undergoing the interview process in the Southern District's pretrial services. That does not include the time that Montana was being transported from the DEA's offices on the upper west side of Manhattan, to the United States Attorney's Office downtown, to pretrial services, and then to the Magistrate's Court. In sum, I find that Montana is familiar with the criminal justice system and voluntarily made statements after a reasonable period of being in custody and questioned. The statements were neither forced nor coerced.

iii. Right to Remain Silent Under the Fifth Amendment

■ Montana alleges that the arresting agents inadequately read him his rights

under the fifth amendment and then continued questioning Montana after he had "refused to respond" to questioning. The section in Montana's affidavit,[1] however, which originally stated, "[t]he agents never read me my rights the whole time they had me under arrest," was crossed out and initialled by Montana, thus indicating that he was advised of his rights. Further, the record indicates that Montana was read his rights as required by *Miranda* during the time he was in DEA custody. H. 139–41.

It is axiomatic that when a defendant invokes his privilege against self-incrimination while in custody, the interrogation must be terminated. U.S. Const. amend. V; *Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir.1989). After learning that Montana was advised of his rights, counsel for the defense asserted that his client did not understand his rights and thus could not invoke proper protection. I disagree. In his affidavit, Montana never alleges that he did not understand his constitutional rights. Moreover, Montana is familiar with the criminal justice system after having been arrested several times, once pled guilty, and served a sentence before this incident ever occurred. The record indicates that although Montana was looking around the room during the reading of his rights, he manifested his assent to having understood them at the end of the reading by nodding. H. 139–41. I find that Montana's familiarity with the criminal justice process renders incredible any assertion that he did not understand the rights read to him after he heard and acknowledged hearing the rights being read.[2]

Counsel further maintains that Montana did not listen to the warnings and therefore could not have assented to them. I disagree. Indeed, that his eyes wandered aimlessly indicates a show of defiance in light of the circumstances. His nodding assent to understanding his constitutional rights render the *Miranda* warnings sufficient.

I find that any further inquiry arising from Montana's spontaneous statement constitutes interrogation. When the agent responded to Montana: "I don't think someone involved in a three-kilo shipment of cocaine is making—is [sic] $50.00;" and "I also informed I [sic] thought that he was probably involved in other shipments because of the such [sic] high amount of cocaine in the mail parcel," he was trying to elicit incriminating responses, thereby constituting interrogation. H. 103–106. *See Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980) ("words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response" constitutes interrogation). Nonetheless, Montana was adequately advised of his rights earlier in the day and he indicated a willingness to be interviewed at the Magistrate's Court by initiating conversation.

iv. Excessive Pre-arraignment Delay

■ Montana contends that the statements made on the evening of May 21, 1990 were the direct result of excessive pre-arraignment delay. Excessive preindictment delay has long been held to be a

---

1. *See United States v. Evans*, 572 F.2d 455, 486 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978) (burden is on defendant/movant to make specific factual allegations of illegality based on personal knowledge in order to warrant a hearing). On the day of the hearing Montana submitted his affidavit in support of his motion to suppress, which I accepted.

2. Montana next asserts that there is no evidence of a waiver of his fifth amendment rights before he made his statements. However, Montana never invoked his Fifth Amendment rights. A defendant must "unequivocally [invoke] his right to remain silent." *Campaneria v. Reid*,

891 F.2d 1014, 1021 (2d Cir.1989). Further, Montana had an unequivocal right to "cut-off questioning." *See Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). "[U]nless and until the accused asks for a lawyer he may waive his procedural *Miranda* rights, . . ." *United States v. Terry*, 702 F.2d 299, 318 (2d Cir.1983). The record before me indicates that prior to Montana's spontaneous comment in Magistrate's court, the agents did not try to interrogate Montana for he earlier failed to respond to questioning. H. 13, 98, 138–42. Interrogation commenced once Montana was asked to elaborate on his voluntarily made statement that he was in all this trouble for only fifty dollars.

basis for the suppression of post-arrest statements. A delay of six hours immediately following arrest or other detention is held to be unreasonable, warranting suppression of the resulting statements. *United States v. Perez*, 733 F.2d 1026 (2d Cir.1984). However, an inculpatory statement shall not be inadmissible if it is made both voluntarily and "within six hours immediately following his arrest or other detention." Fed.R.Crim.P. 5(a); 18 U.S.C. § 3501(c) (1976).

Moreover, the Second Circuit has established that delay due to the unavailability of a Magistrate and the resulting overnight lodging of the defendant should not be counted in computing the six-hour period. *United States v. Rubio*, 709 F.2d 146, 153–54 (2d Cir.1983) (defendant's statement held admissible although given nearly two days after weekend arrest where, except for quite reasonable periods of time actually spent in processing and in routine questioning, the hours between arrest and arraignment were spent mainly in lodging at the Manhattan Correctional Center ("MCC") while awaiting arraignment). Here, Montana spent the majority of his time on May 21, 1990 engaged in routine processing activities. Further, the time spent being lodged overnight at the MCC does not figure into the six-hour calculation. Therefore, in light of the fact that Montana was not being interrogated during almost all of the post-arrest and pre-arraignment time, I find that his statements of May 21st and 22nd are admissible as having been well within the six-hour period. *See also United States v. Collins*, 462 F.2d 792, 795–96 (2d Cir.) (twenty-one hours between arrest and confession found not unreasonable when majority of the time was spent in transit, routine processing, and overnight lodging), *cert. denied*, 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972). There was no purposeful postponement of arraignment and no lengthy, hostile, or coercive interrogation which caused Montana to be prejudiced. Therefore, any statements deriving from conversations between agents and Montana are sufficient to withstand this motion to suppress.

For the foregoing reasons, Gomez' motion is granted only insofar as any of Montana's statements naming Gomez should be redacted to remove reference to Gomez by name. All other aspects of Gomez' motion are denied. Montana's motion to suppress his statements is denied in its entirety. In accordance with the hearing minutes, statements made by Montana, (regarding his asking who was to take care of his family,) in the DEA agent's car while on the way the DEA's offices will not be offered by the Government as being unduly prejudicial and subject to several interpretations.

SO ORDERED.