Ricardo NOVA, Petitioner,

v.

George BARTLETT, Superintendent at Elmira Correctional Facility, Respondent.

No. 95 Civ. 10265 (CBM).

United States District Court, S.D. New York.

Sept. 9, 1999.

Peluso & Touger by David Touger and Michelle Flaxman, New York City, for petitioner.

District Attorney's Office for New York County by Donald J. Siewert, New York City, for respondent.

### OPINION

MOTLEY, District Judge.

Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that his confession was obtained in an unconstitutional manner. Petitioner asserts that he was not given the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to being subjected to a custodial interrogation. Petitioner further claims that his later, fully warned confessions should also have been suppressed because they were tainted by the prior, illegally obtained statement. For the reasons stated herein, petitioner's application for a writ of habeas corpus is denied.

### BACKGROUND

A. *Facts*

On Sunday, September 2, 1990, Brian Watkins, his mother, father, brother, and sister-in-law were standing on a subway platform at 53rd Street and Seventh Avenue. The Watkins family, residents of Utah, was visiting New York City for the U.S. Tennis Open Tournament. At approximately 10:15 p.m., petitioner and a large group of teenagers from Queens arrived at the 53rd Street and Seventh Avenue subway station. The group was heading for Roseland, a dance club in midtown Manhattan. However, some of petitioner's friends did not have enough money to pay the entrance fee into Roseland.

At this point, petitioner and six of his friends decided to commit a robbery, with the Watkins family as their target. Petitioner and his accomplices reentered the subway station and surrounded the Watkins family. During the robbery, the father was cut with a razor and robbed of his money, the mother was knocked to the ground and beaten, and Brian Watkins was fatally stabbed in the chest. He died from his injuries en route to St. Vincent's Hospital, where he was taken immediately following the robbery. As the robbers fled the subway, petitioner was handed $200 of the robbery proceeds. The group then went directly to Roseland where petitioner purchased $120 worth of tickets with the money obtained in the robbery.

The police arrived at the crime scene shortly thereafter. A bystander told police that he observed a group of about

thirty youths exit the subway. When he asked them where the party was, someone in the group replied, "at Roseland." The witness also informed police that six to eight members of the group lagged behind. He saw one male remain at the top of the subway entrance while the rest reentered the subway station and came running out several minutes later. The witness accompanied police to Roseland at approximately 11:40 p.m. and was able to identify one of the robbers, Anthony Anderson. Anderson was then taken to Midtown North Precinct for questioning. During Anderson's interrogation, he implicated petitioner as being an active participant in the robbery. Anderson described his accomplices and told police that they were still at Roseland.

At approximately 4:00 a.m., five to six police officers returned to Roseland and stopped Joseph Santana, a person whom Anderson had described as being part of the crowd heading for Roseland. Santana pointed out a group of individuals matching the descriptions given by Anderson. The police approached the group in a fanned-out position to stop them from running away. The police directed the group to move up against a wall to separate them from the crowd of exiting Roseland patrons. Detective Rosario then patted down petitioner's outer pocket and recovered a silver colored knife with metal knuckles, which petitioner told police belonged to a friend. In this group were two other accomplices that Anderson had described to police. The police told the three youths that they were going to the police station to give their statements and would be allowed to leave afterwards. The rest of the people in petitioner's group were allowed to leave. The police indicated that the three youths were considered possible witnesses to the subway robbery, although the police really considered them to be suspects at this time. Petitioner, along with the two accomplices, accompanied police to the Midtown North Precinct, un-handcuffed.

At the Midtown North Precinct, petitioner made numerous incriminating statements, including a videotaped statement describing his involvement in the robbery. Petitioner was also positively identified by two of the victims in line-ups conducted on September 3, 1990.

## B. *Prior Proceedings*

Prior to trial, petitioner moved to suppress the inculpatory statements he made at the precinct. Justice Torres of the Supreme Court of the State of New York, New York County, held a hearing on petitioner's motion and made the following findings of fact. Upon petitioner's arrival at the Midtown North Precinct at approximately 4:45 a.m. on September 3, 1990, petitioner was taken to a coffee room on the third floor. Detective Rosario and Sergeant Borman began questioning petitioner some time before 6:00 a.m. Neither detective issued petitioner *Miranda* warnings. For the next hour and a half, petitioner recounted his activities during the previous night. His story did not match what others had told the detectives, and at one point, a discrepancy arose over the amount of money petitioner was carrying. At this point, petitioner said, "All right, I'll tell you the truth. I ain't going to fool around with you. I'll tell you the honest truth." Tr. at 673, 772.[1]

The detectives then advised petitioner of his *Miranda* rights at approximately 7:10 a.m. Petitioner acknowledged his rights and then waived them.[2] Petitioner then gave a long detailed oral statement admitting his participation in the crime. Detective Rosario wrote out petitioner's statement, read it aloud for petitioner, and petitioner signed the statement. Later

---

1. All references to "Tr." refer to the transcript of the suppression hearing before Justice Torres on June 17, 1990.

2. Petitioner does not challenge the sufficiency of the *Miranda* warnings given nor does he dispute that they were administered at 7:10 a.m.

that morning, Detective Swenson, who was unaware that a written statement had already been taken, had petitioner write out another statement. This second statement was signed by both petitioner and Detective Swenson. Approximately 7:45 p.m. that evening, petitioner gave a third statement to Assistant District Attorney Donna Henken, which was videotaped. Before this statement, he was reissued *Miranda* warnings, which he again waived. Petitioner also made incriminating statements during the day while he was handcuffed to a railing of a stairwell with his co-conspirators.

Justice Torres found that all of petitioner's statements made at the police station were admissible at trial. Justice Torres held petitioner's initial statements made during the first hour and a half were admissible since petitioner was not in a custodial setting. Petitioner's oral, written, and videotaped statements made thereafter were also held to be admissible since petitioner was advised of his *Miranda* rights, which he knowingly and voluntarily waived. Justice Torres also found that petitioner's statements made while handcuffed to the railing were admissible because they were not a product of interrogation.

On December 10, 1991, following a seven-week jury trial, petitioner was convicted of one count of Felony Murder in the Second Degree, under New York Penal Law Section 125.24(3), for the killing of Brian Watkins, and two counts each of Robbery in the First and Second Degrees, under New York Penal Law Sections 160.15(3), 160.10(1) and 160(2)(a), for the robbery of the Watkins family. Thereafter, petitioner was sentenced to concurrent terms of twenty-five years to life imprisonment for murder, eight and one-third to twenty-five years for first-degree robbery, and five to fifteen years for second-degree robbery.

On January 3, 1992, after the jury verdict but prior to sentencing, petitioner brought a motion pursuant to New York Criminal Procedure Law Section 440.10 to set aside the verdict on the grounds that the trial court issued legal instructions to the jury in the absence of petitioner's counsel. Justice Torres summarily denied the motion on May 18, 1992, but granted leave to appeal and consolidated the matter with petitioner's direct appeal to the Appellate Division, First Department. By Decision and Order dated November 30, 1993, the Appellate Division affirmed the trial court's judgment of conviction. *See People v. Nova,* 198 A.D.2d 193, 603 N.Y.S.2d 863 (1st Dept.1993). On February 17, 1994, the Court of Appeals denied leave to appeal. Petitioner then filed a timely application for a writ of habeas corpus on December 5, 1995.

## DISCUSSION

### A. *Right to Miranda Warnings*

In *Miranda,* the Supreme Court set forth a bright-line rule that a person must be advised that he has "the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," before being subjected to a custodial interrogation. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The Court held that such warnings were necessary in order to safeguard an individual's right under the Fifth Amendment to the Constitution not to be compelled to incriminate himself. *See id.* at 439, 86 S.Ct. 1602.

■ A person is considered in custody when his "freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam)). The Second Circuit has elaborated on the custody test by holding that "[a]n accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that

they would not permit the accused to leave." *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir.1998) (finding suspect in custody after two hours of increasingly hostile questioning at the police station where police repeatedly questioned suspect's credibility and confronted him with false evidence of his guilt).

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (finding defendant not entitled to *Miranda* warnings when questioned at the police station by officers who subjectively believed defendant to be the prime suspect); *see also Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time."); *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (finding suspect in a criminal tax fraud investigation not in custody when interviewed by IRS agents at his private home despite the fact that he was the focus of the investigation at the time he was questioned).

■■■■ A habeas court is free to make the custody determination independently since it involves a mixed question of law and fact. *See Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (holding state court determinations of the custody prerequisite for *Miranda* purposes are not entitled to any presumption of correctness). In making such a determination, the habeas court must examine all the circumstances surrounding the interrogation, including:

> whether a suspect is or is not told that she is free to leave, see *Campaneria v. Reid*, 891 F.2d 1014, 1021 n. 1 (2d Cir. 1989); the location and atmosphere of the interrogation, *see Oregon v. Mathiason*, 429 U.S. 492, 494–95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); the language and tone used by the police, *see United States v. Guarno*, 819 F.2d 28, 31–32 (2d Cir.1987); whether the suspect is searched, frisked, or patted down, *see United States v. Wilson*, 901 F.Supp. 172, 175 (S.D.N.Y.1995); and the length of the interrogation, *see Berkemer*, 468 U.S. at 437–38, 104 S.Ct. 3138.

*Tankleff*, 135 F.3d at 244. However, "the ultimate inquiry for custody determinations is whether a reasonable person in the suspect's position would have felt that he was free to terminate the interrogation and leave." *Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517.

#### 1. *Reasonable Person Standard*

Here, petitioner and a group of ten to fourteen of his friends were approached by five to six officers in a fanned-out position. The group was separated from the rest of the Roseland crowd and ordered to move up against the wall. Detective Rosario patted petitioner down, and a "crocodile" clasp knife was confiscated from his person. "[Detective] Rosario then told [petitioner] that a crime had been committed in the subway, that the detectives believed [petitioner] was a witness and that they would like to take him to the precinct to talk[,] ... [as] there were too many people around to talk out in the street." Resp. Mem.Opp. Habeas Petition at 16.

The actions of the officers revealed their true objective—to take the suspects into custody, at least for the purposes of questioning them at the station. The police detained petitioner and two other suspects while *"the others were allowed to leave." Id.* (emphasis added). Detective Borman then told the remaining three youths that *"as soon as their statements were finished the police would let them go." Id.* at 17 (emphasis added). Petitioner rode to the precinct in the back of a police car with Detective Borman sitting between him and Pascal Carpenter, another suspect.

Critical to the custody inquiry is whether a reasonable person in petitioner's position would have objectively felt free to

leave. Petitioner asserts that he did not feel free to leave when he was taken to the precinct by the police and, therefore, claims to have been effectively taken into custody. A review of the facts confirms petitioner's belief that he did not appear to be free to leave. He was found carrying a weapon that the police confiscated. He was surrounded by five to six police officers who permitted a majority of his friends to go but conditioned his freedom on the taking of his statement at the stationhouse. Detective Borman testified at the suppression hearing that he told the three suspects that, "We were going into the house, the stationhouse. We were going to take a statement.... And *as soon as we finished the statement, we're going to let you go.*" Tr. at 658 (emphasis added). The police also testified that their "fanned-out" approach was calculated to prevent the three suspects from walking or running away. Tr. at 870. Semantics aside, under these circumstances the detective's "request" for petitioner to give a statement at the precinct was more like a command, one that was not subject to being challenged.

Although the police acted professionally and kept things "low key" while talking to petitioner and his two accomplices (*i.e.,* the police did not draw their weapons, arrest, or handcuff anyone), that does not alter the objective perception that a reasonable person in petitioner's position would not have felt free to leave. Whether the police would have arrested petitioner if he refused to accompany them to the precinct is irrelevant. The situation must be considered from the perspective of a reasonable person in the petitioner's position, and not from that of the police. The police approached petitioner's group in a fanned-out manner to prevent the three youths from escaping. Petitioner was patted-down, and a weapon was confiscated from his person. On that basis alone, petitioner could have reasonably believed that he was not free to leave and was even subject to arrest if he failed to cooperate with police. *Cf. U.S. v. Estrada–Lucas,* 651 F.2d 1261, 1265–66 (9th Cir.1980) (holding suspect in custodial setting for *Miranda* purposes at customs inspection where police had probable cause to arrest and suspect reasonably believed that he was not free to leave); *U.S. v. Cadmus,* 614 F.Supp. 367, 373 (S.D.N.Y.1985) (holding statements inadmissible where police failed to issue *Miranda* warnings prior to interrogating suspect where there was probable cause to arrest). The fact that the police confiscated a weapon from petitioner and then told him that he could leave only after giving them a statement at the precinct (while allowing others to leave) would give any reasonable person in the petitioner's position the impression that he was not free to leave.

█ The conditions at the precinct further highlight the view that, from an objective standpoint, petitioner did not appear to be free to leave. He was guarded by police at all times, including escorted trips to the bathroom. The police never told petitioner that he was not under arrest or that he was free to leave at any time. Petitioner was not given an opportunity to contact a lawyer, friend, or family member before the detectives began interrogating him. Petitioner was not allowed to leave following his interrogation because the police clearly had enough probable cause to arrest petitioner and properly did so. These factors—voluntariness of arrival, police clarification of status, and ability to leave following the questioning—are critical indicia of custody or non-custody. *See Mathiason,* 429 U.S. at 495, 97 S.Ct. 711 (finding defendant not in custody where he voluntarily came to the police station, was immediately informed that he was not under arrest, and was allowed to leave without hindrance at the close of the interview). Additionally, the police questioned petitioner's credibility at varying points during the initial ninety-minute interview before he was Mirandized. Detective Rosario gave petitioner what

Detective Borman described as "the father figure speech":

> Listen, Ricky, we're here, we just want a statement, you're starting to lie. You're telling us that things don't happen. The money don't match. We're talking to other people. Other people are giving us information. If they all tell us one story and you tell us one big lie, it is going to look silly. Why don't you tell us what happened[?]

Tr. at 672–73. This speech demonstrates that the questioning was in fact an interrogation—the police did not believe petitioner and were trying to induce him to implicate himself in the robbery. A lengthy interrogation where the police utilize pressure tactics supports a finding of custody. *See Tankleff*, 135 F.3d at 244.

Detective Rosario's comments further indicated to petitioner that he was now considered a suspect by the police. This knowledge impacts on the custody issue. "An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." *Stansbury*, 511 U.S. at 325, 114 S.Ct. 1526. Given the circumstances involved in this case, it is this court's view that a reasonable person in petitioner's position would not have felt free to leave.

### 2. Precedent Applying the Reasonable Person Standard in the Custody Context

The scope and reach of the *Miranda* doctrine have been significantly limited since 1966. Since *Miranda* was decided, the Supreme Court has repeatedly held that the *Miranda* rule reaches beyond the bounds of the Fifth Amendment, acting more like a set of prophylactic safeguards than a constitutional mandate. *See, e.g., Michigan v. Tucker*, 417 U.S. 433, 443–44, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). As such, the Court has curtailed *Miranda*'s impact. *Compare Miranda*, 384 U.S. at 476, 86 S.Ct. 1602 (finding that *Miranda* warnings and effective waiver are "neces-

sary ... prerequisites to the admissibility of any statement made by a defendant" during a custodial interrogation), *with Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (finding second warned confession admissible even where first confession was elicited in violation of *Miranda*) *and Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (holding statements obtained in violation of *Miranda* may be used for impeachment purposes).

Furthermore, the Court has narrowed the concept of custody for *Miranda* purposes in ways that are, at times, in tension with the reasonable person standard. *See, e.g., Stansbury*, 511 U.S. at 325, 114 S.Ct. 1526 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue."); *Berkemer*, 468 U.S. at 436, 104 S.Ct. 3138 (holding routine traffic stop does not render one in custody for *Miranda* purposes even though "few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop"); *Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (finding defendant not in *Miranda* custody even though police presented him with false evidence of his guilt during questioning at the police station); *Beckwith*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (being the focus of a criminal investigation is not sufficient to render one in *Miranda* custody).

The Second Circuit has, in turn, followed the Supreme Court's lead in limiting the applicability of the *Miranda* rule. *See, e.g., Tankleff*, 135 F.3d 235 (holding circumstances surrounding first, unwarned statement were not so coercive as to require suppression of second, warned statement); *United States v. Cota*, 953 F.2d 753, 756–59 (2d Cir.1992) (suspect not in *Miranda* custody even though she was removed from her car at gunpoint and handcuffed before acceding to the police's request for stationhouse interview); *United States v. Morales*, 788 F.2d 883 (2d

Cir.1986) (allowing defendant's inadmissible pre-arrest statement, which was obtained in violation of *Miranda*, to be considered for probable cause determination).

In *Cota*, defendant's extended family was involved in a multi-million dollar heroin trafficking ring. Drug Enforcement Administration agents told the police to be on the look-out for a maroon Cadillac, which was thought to belong to Cota's brother, David Hernandez, a fugitive from justice. On July 13, 1989, Cota was stopped by police on suspicion that she was harboring her brother. For safety reasons, police made Cota exit her vehicle at gunpoint and handcuffed her. Cota's husband and niece were riding in another vehicle behind Cota. Cota's husband, the driver of the second vehicle, was also stopped by the police. After the police determined that the suspected fugitive was not in Cota's car, Cota was unhandcuffed. The police then seized the Cadillac and asked the Cotas if they would come to the police station for questioning about how and why they came to be in possession of the seized car. The Cotas agreed to accompany police to the station. While at the station, Cota made several incriminating statements that were later used as evidence of her knowledge of her family's participation in drug trafficking schemes. The court upheld Cota's convictions and determined that she was not entitled to *Miranda* warnings before she was questioned at the stationhouse as she was not in custody at that time. The court reasoned that "Cota's willingness to accompany the officers to the station … was spurred by her own concern for the return of her seized car, rather than by the allegedly coercive environment of the stop." *Cota*, 953 F.2d at 759.

By finding that Cota was not in custody when she followed police to the stationhouse for questioning, the Second Circuit appears to be implying that it was unreasonable for Cota to feel that she was not free to leave, even though the police held her at gunpoint, handcuffed her, and then seized her car. Although the police's actions were justified under the circumstances, their actions most certainly would have impacted any reasonable person's choice to submit to questioning.

The interpretation of the reasonable person standard in *Cota* is troubling because it demonstrates how much power the courts are entrusting to police to decide when and, more distressingly, whether *Miranda* warnings are required. *Cota*, in line with recent Supreme Court precedent on *Miranda* custody determinations, seems to suggest an unsettling proposition: that a reasonable person should feel free to leave or to deny police requests for stationhouse questioning in all circumstances except where the police explicitly tell the person that he or she is under arrest or that he or she is not free to leave. More alarming is the apparent focus on what the police *say* to Cota rather than what they *communicate* to her. The holding that a reasonable person in Cota's position would feel free to disobey (deny) a police command (request) for stationhouse questioning makes it difficult for this court to apply a practical reasonable person standard in the present case.

■ If a true reasonable person standard is to be applied, then the courts must recognize the how actual people reasonably behave when encountered by the police. A faithful and practical application of the reasonable person standard should reflect how the ordinary citizen reacts when confronted by a police order for stationhouse questioning (even if masqueraded as a request), particularly when faced with the knowledge that the police view him as a suspect or have evidence that he has committed some wrongdoing. There are many situations where the police have not directly told a person that they are not under arrest or are free to leave, but where a reasonable person would not feel free to leave. Such was the case here. Petitioner was not directly told that he was not free to leave; however, his perception that he was being detained was reasonable.

B. *Custody Determination*

However, the court is constrained by the precedents referenced above. Accordingly, petitioner cannot be said to have been in *Miranda* custody at any point prior to 7:10 a.m. when he was first issued *Miranda* warnings, notwithstanding the court's finding that a reasonable person in petitioner's position would not have felt free to leave. Under the binding precedent described above, the circumstances surrounding petitioner's trip to Midtown North Precinct are not, as the Supreme Court and the Second Circuit have construed the reasonable person standard, such that a reasonable person would not have felt free to leave. *See Stansbury,* 511 U.S. at 323–25, 114 S.Ct. 1526; *see also Cota,* 953 F.2d at 758–59.

The internal inconsistency in this opinion stems from the dissonance between the standard for reasonableness for those faced with requests for police interrogation at the stationhouse and how reasonable people actually behave. The tension is also rooted in the inherent struggle that courts face when balancing the competing interests of giving the police enough deference to combat crime effectively and of providing individuals subjected to custodial interrogation sufficient protection of their constitutional rights. When *Miranda* was decided, the Court emphasized the former, finding that safeguards were needed to protect the individual's rights from police overreaching and the grave potential for coercion. In recent years, courts have attempted to emphasize the latter by reaffirming the police's proper scope of authority.

However, in their efforts to give the appropriate amount of deference back to the police (i.e., to let them do their job and not to unduly hamper their crime fighting efforts), courts may be understating the impact that police actions, even when justified and reasonable, have on the reasonable person. *E.g., Cota,* 953 F.2d 753. These courts have conveyed the troubling, and hopefully mistaken, message that rea-sonable people are generally bold enough to disobey police directives, even when formed as "requests," and are generally uncooperative with police. Truly reasonable people do not act as boldly as the precedents suggest. Reasonable people are susceptible to police pressure, such as when faced with the knowledge that police view them as suspects, when the police confront them with evidence that they have committed some illegality, and particularly when *both* of these situations apply, as was the case here. There are many situations where the police have acted justifiably but have created a situation where a reasonable person would not feel free to leave. It is not realistic for the courts to assume that, short of the police unequivocally communicating that one is not free to go, a reasonable person will always feel free to leave.

This interpretation of the reasonable person standard seems to be ripe for re-creating situations that *Miranda* intended to address. By making the need for *Miranda* protections largely dependent on the police's choice of words, courts give police the ultimate discretion to decide when and whether a situation calls for *Miranda* warnings. This compromises an individual's constitutional rights, with the police acting as the final judges of whether such rights are implicated. The goal of *Miranda* is to protect individuals in custodial interrogations from the potential danger of all forms of police coercion—not only abuse and improper coercion, but also proper police pressure tactics that should trigger a *Miranda* reading. It is not in the spirit of *Miranda* to allow these warnings to be administered on an *ad hoc* basis, with the police having broad discretion to avoid the *Miranda* rule, without consequences.

*Miranda* warnings were meant to safeguard an individual's Fifth Amendment rights in all cases where police interrogate a person held in custody. Although it is difficult to interpret custody in the absence of a practical reasonable person standard,

this court must follow precedent on this issue. So although it would appear to the court that a reasonable person in the petitioner's position would not have felt free to leave, the weight of the case law is clear. Precedent dictates that petitioner's circumstances do not amount to those where a reasonable person would not feel free to leave. Thus, adhering to precedent, this court must conclude that petitioner was not in custody for *Miranda* purposes and, therefore, was not entitled to any *Miranda* warnings at any point prior to 7:10 a.m.

### C. *Admissibility of Petitioner's Post–Miranda Statements*

 Petitioner further claims that his later oral, written, and videotaped statements made after he was issued *Miranda* warnings should have been suppressed because they were tainted by the initial pre-*Miranda* questioning. This claim is without merit.

First, petitioner did not make an incriminating statement prior to receiving *Miranda* warnings. Petitioner made his first oral confession only after he was given *Miranda* warnings. Thus, even assuming that he was in custody and his pre-*Miranda* statements should have been suppressed, it would amount to harmless error. *See Brecht v. Abrahamson,* 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Campaneria,* 891 F.2d at 1019–20 (holding admission of statements obtained in violation of *Miranda* harmless where statements were cumulative to properly admitted declarations establishing suspect's involvement in crime).

■ Furthermore, even if petitioner did make an incriminating statement prior to receiving *Miranda* warnings, this court finds the circumstances surrounding petitioner's first, unwarned statement do not rise to the level of coercion necessary to render his later, fully warned statements inadmissible. *See Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (holding confession obtained in violation of *Miranda* but without other physical or psy-chological coercion present is not, by itself, sufficiently coercive as to render the second, fully warned confession inadmissible); *see also Tankleff,* 135 F.3d at 244–46. Since the court has already determined that petitioner was not in custody when he made his initial statements, *Miranda* warnings were not required. Petitioner's later statements were also properly held to be admissible since petitioner was given *Miranda* warnings, which he knowingly and voluntarily waived. *See Campaneria,* 891 F.2d at 1019–20.

### CONCLUSION

For the foregoing reasons, petitioner's application for a writ of habeas corpus is denied. However, this court grants petitioner a certificate of appealability for an appeal to the Second Circuit from the denial of his *Miranda* claim. *See* 28 U.S.C. § 2253(c)(2) (1994 & Supp.1997); *Nelson v. Walker,* 121 F.3d 828 (2d Cir.1997). The Clerk of Court is to enter judgment accordingly and notify petitioner of his appeal rights.