**UNITED STATES of America**

v.

**Kimberly GRAHAM.**

**No. Crim. 3:99CR271(CFD).**

United States District Court, D. Connecticut.

Oct. 26, 2000.

Lewis H. Chimes, Garrison, Phelan, Levin–Epstein, Chimes & Richardson, New Haven, CT, for plaintiff.

Karen L. Peck, Assistant U.S. Attorney, District of Connecticut, New Haven, CT, for defendant.

## RULING ON MOTIONS TO SUPPRESS

DRONEY, District Judge.

The defendant, Kimberly Graham, was indicted for conspiracy to possess with intent to distribute 100 grams and more of mixtures and substances containing a detectable amount of phencyclidine (PCP) in violation of 21 U.S.C. §§ 841(a)(1) and 846. She has filed a motion to suppress physical evidence, a motion to suppress statements, and a motion to suppress evidence seized from her residence. For the following

reasons, each of the motions to suppress is DENIED

## I. Background

The defendant claims several violations of the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution in her suppression motions. These claims arise mainly from a motor vehicle stop on November 13, 1999, by police officers assigned to the New Haven Drug Task Force. During the stop, the officers searched the vehicle and seized two bottles of liquid PCP. The defendant, who was driving the car, made statements to the officers following their discovery of the PCP Although the defendant was not arrested at that time, Task Force officers later obtained and executed a search warrant for the defendant's home at 10 Rosewood Avenue in New Haven, Connecticut, from which they recovered additional evidence.[1]

The defendant was charged by a single-count indictment on November 30, 1999 with conspiracy to possess with intent to distribute 100 grams and more of mixtures and substances containing a detectable amount of PCP. On March 9, 2000, the defendant filed a motion to suppress physical evidence on the ground that the Task Force officers lacked probable cause to stop or search the car she was driving on November 13, 1999, including a search of her purse found in the car, in violation of the Fourth and Fourteenth Amendments.[2] The defendant also filed a motion to suppress statements on March 9, 2000, claiming that her statements to the officers following their discovery of the PCP were made in violation of the Fourth, Fifth, and Fourteenth Amendments. In addition, on March 10, 1999, the defendant filed a motion to suppress evidence seized from 10

---

1. This evidence included $3,600.00, a leafy substance in tin foil that contained PCP, mint leaves similar to those used to prepare PCP for ingestion, packaging materials, and a notebook. PCP is typically ingested by smoking mint leaves soaked in the drug.

2. The defendant moved to suppress the two bottles of liquid PCP. It is unclear whether she also moved to suppress her purse as physical evidence; this opinion will assume that she did.

Rosewood Avenue on the ground that the search warrant lacked probable cause, was based in part on illegally seized evidence from the car stop, and included false and misleading information in violation of the Fourth and Fourteenth Amendments.[3] The Court conducted evidentiary hearings on the motions to suppress on June 19 and 27, 2000.

## II. Findings of Facts

The Court makes the following findings of fact based on the evidence presented at the hearings on the suppression motions, which the government has proven by a preponderance of the evidence. *See U.S. v. Matlock*, 415 U.S. 164, 177 & n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

The Drug Enforcement Administration in New York City began an investigation in July 1999 of Mark Godfrey Theus, also known as "Sanchez," a suspected distributor of liquid PCP. During the course of its investigation, the DEA learned that Mr. Theus was providing PCP to Michelle Little and other individuals in New Haven, Connecticut. The DEA contacted the Task Force in New Haven to determine whether it had any information concerning Ms. Little or the other individuals. The Task Force then began its own investigation of Ms. Little, among others. As part of their investigation, Task Force officers received information from reliable confidential informants confirming that Ms. Little was involved in selling PCP with an unidentified female partner. They also observed Mr. Theus at Ms. Little's home in New Haven. In addition, they conducted judicially authorized electronic surveillance of Ms. Little, which included wiretaps of her telephone.[4] The Task Force had no information concerning the defendant or her suspected involvement in criminal activity, however, prior to November 13, 1999.

On November 12, 1999, Task Force officers monitored a telephone call between Mr. Theus and Ms. Little, in which they agreed to meet the next day in New York so that Ms. Little could purchase PCP from Mr. Theus. Ms. Little called 10 Rosewood Avenue the next morning and asked to speak to "Kim." When the person who answered the phone refused to awaken Kim, Ms. Little indicated that she would stop by and awaken Kim herself. Ms. Little then paged Mr. Theus, who called her in response. Mr. Theus and Ms. Little arranged to meet at a car wash in New York City, where they had met on previous occasions, so that Ms. Little could purchase nine ounces of liquid PCP from Mr. Theus. Ms. Little also indicated to Mr. Theus that she would leave Connecticut around 10:00 a.m. and would bring someone with her.

Task Force officers placed Ms. Little under physical surveillance and followed her in a gray Lexus to 10 Rosewood Avenue, where she picked up a female later identified as the defendant.[5] The officers followed the two women in the Lexus as they headed south on Interstates 91 and 95 toward New York. After breaking off their surveillance near Fairfield, Connecticut, the officers alerted the DEA in New York.

Shortly thereafter, the DEA advised the Task Force that its agents observed Mr. Theus meet with Ms. Little and the defendant at the car wash, and that the women were headed back to Connecticut in the

---

**3.** The defendant also contended that Task Force officers failed to knock and announce their presence when executing the warrant. However, as set forth on the record at the suppression hearing, the defendant has withdrawn that claim.

**4.** The defendant does not contest the legality of the judicially authorized electronic surveillance, including the wiretaps

**5.** It is unclear exactly when the Task Force identified the defendant as "Kimberly Graham." However, it is undisputed that the Task Force had not identified her prior to the car stop on November 13, 1999. *See also infra* note 9. It is also undisputed that the defendant resided at 10 Rosewood Avenue.

Lexus. Task Force officers resumed physical surveillance of the Lexus as it returned to Connecticut and headed toward New Haven. Detective Samuel Cotto and Detective Rafael Segarra, who were New Haven police officers assigned to the Task Force, decided to stop the Lexus. They hoped to recover the nine ounces of PCP discussed in the conversation between Mr. Theus and Ms. Little, which they suspected would be in the car following the meeting at the car wash. After observing the Lexus speeding at approximately 85 to 90 miles per hour, the detectives stopped the car on Route 80 near Middletown, Connecticut. The detectives were wearing police uniforms and driving a marked police cruiser in order to appear as if the stop were a routine traffic stop.

As the detectives approached the Lexus, they observed the defendant in the driver's seat and Ms. Little in the front passenger seat. Neither the defendant nor Ms. Little was wearing a seatbelt. Detective Cotto told the defendant and Ms. Little that they had been stopped because they were speeding. He asked the defendant to get out of the car and sit in the police cruiser while Detective Segarra prepared an infraction for driving without a seatbelt. Detective Cotto told the defendant that she would receive only a verbal warning for speeding, and said to her "you'll be on your way" once the seatbelt infraction was prepared. Neither police officer mentioned the PCP investigation, and neither the defendant nor Ms. Little was placed under arrest. However, Detective Cotto patted down the defendant with the back of his hand before placing her in the back of the police cruiser.

As Detective Segarra sat in the driver's seat of the police cruiser, Detective Cotto returned to the Lexus. He asked Ms. Little for the vehicle's registration and insurance card so that Detective Segarra could prepare the infraction. Ms. Little opened the glove box and, as she did so, Detective Cotto observed a small bottle roll forward. Ms. Little attempted to cover the bottle with her left hand while handing the registration and insurance information to the detective with her right hand.[6] Detective Cotto recognized the bottle as matching a description previously provided by the DEA in New York of the ounce-size packages of PCP sold by Mr. Theus. He also saw that the clear-glass bottle contained a yellow-brown liquid substance consistent with the color of liquid PCP.

Detective Cotto asked Ms. Little to get out of the car and placed her in the back of the police cruiser with the defendant. He then went back to the car and seized the bottle from the glove box. He opened it and immediately smelled the odor of PCP.[7] He returned to the police cruiser with the bottle and asked Ms. Little and the defendant what was in it. They indicated at first that it was musk cologne, and then told the detective that it was a spiritual oil that they purchased in New Haven. Although Detective Cotto believed the substance in the bottle was PCP, he did not reveal that he thought it was PCP. He expressed doubt as to whether it was spiritual oil and indicated that he was going to send it to a laboratory and have it analyzed.

Given the small size of the bottle, and believing that there were at least nine ounces of liquid PCP in the Lexus, Detective Cotto returned to the car and looked inside it. He slid the front seat of the car forward and discovered an open purse on the floor of the back seat. In the top of the purse, Detective Cotto could see a

---

6. After providing Detective Cotto with the registration for the Lexus, which indicated that the car belonged to "Michelle Little," Ms. Little stated that she was "Michelle Durham," that the car did not belong to her, and that she and the defendant had borrowed the car from a friend.

7. Detective Cotto testified that as a police officer he was familiar with, and had smelled, liquid PCP before this incident.

second, larger clear-glass juice bottle containing a similar yellow-brown liquid substance consistent with the color of liquid PCP.[8] He seized the second bottle, opened it, and immediately smelled the odor of PCP. Again, he returned to the police cruiser with the bottle and asked Ms. Little and the defendant what was in it without revealing that he thought it was PCP. They indicated that it, too, was spiritual oil. Detective Cotto then expressed doubt as to whether it was spiritual oil and indicated that he was going to have it tested as well. He also indicated that if the substance were determined not to be spiritual oil, warrants for their arrests would probably be issued. Detective Cotto stated again, however, that Ms. Little and the defendant were not going to be arrested at that time.

When Detective Segarra finished preparing the infraction and the defendant got out of the police cruiser, he explained to her how she should respond to the ticket. At the same time, Detective Cotto accompanied Ms. Little from the police cruiser back to the Lexus. He asked her who owned the purse, and she indicated that she did not know, that it was left there by the owner of the car. Detective Cotto told Ms. Little that since she did not know who the purse belonged to, he would go through it and find out who owned it. As he began looking through the purse for identification, the defendant approached him and asked what he was doing going through her purse. The detective gave the purse back to the defendant. She and Ms. Little then left the scene, and the detectives field-tested the liquid from the seized bottles, which tested positive for

liquid PCP. The entire encounter lasted approximately ten minutes.

Later that day, the Task Force monitored a telephone call between Ms. Little and the defendant, in which they discussed the car stop and the seizure of PCP. The defendant also indicated that she going to purchase additional PCP.[9] Ms. Little and Mr. Theus also discussed the car stop and the seizure of PCP over the telephone later that night.

On November 14, 1999, Ms. Little and Mr. Theus spoke again and agreed to meet where they had met the previous day, at the car wash in New York City. The Task Force and DEA in New York conducted physical surveillance of the defendant and Ms. Little as they traveled to New York City in a green Mazda. The DEA further advised the Task Force that Ms. Little and the defendant met with Mr. Theus at the car wash and were returning to Connecticut in the Mazda. Task Force officers conducted physical surveillance of the Mazda, which they learned was registered to the defendant's mother, as it returned to Connecticut.[10] They followed the Mazda to a residence in New Haven, which they subsequently learned from a reliable confidential informant was used for drug dealing activities, and later observed it parked at the defendant's residence at 10 Rosewood Avenue. Based on the preceding information, on November 16, 1999. Senior U.S. District Judge Ellen B. Burns signed a search warrant for 10 Rosewood Avenue. Task Force officers executed the search warrant on November 18, 1999 and recovered evidence from the defendant's bedroom at the residence.[11]

8. The bottle had a juice label, but did not contain a red or maroon liquid matching the appropriate juice color.

9. At Ms. Little's urging, however, the defendant returned to New Haven so that they could pool their money. In addition, the Task Force had identified the defendant as "Kimberly Graham" by this point. *See also supra* note 5.

10. The defendant's mother also resided at 10 Rosewood Avenue.

11. As set forth on the record at the suppression hearing, the Court considers the post-car stop evidence only as it relates to the validity of the search warrant for 10 Rosewood Avenue, which was prepared after the stop. It is not relevant to the validity of the car stop and has not been considered in relation to that encounter.

## III. Discussion

### A. *Legitimate Expectation of Privacy in the Lexus and Its Contents*

 The government initially contends that the defendant had no legitimate expectation of privacy in the Lexus, which was registered to Ms. Little, and thus she cannot challenge the stop or search of the Lexus. Although the government concedes that the defendant had a legitimate expectation of privacy in her purse, which was found in the Lexus, the government argues that the defendant did not have a sufficient property interest or possessory interest in the car to create a legitimate expectation of privacy in the car itself. *See Rakas v. Illinois,* 439 U.S. 128, 148–49, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (Rehnquist, J., plurality). The government therefore argues that the defendant's Fourth Amendment rights were not violated by the stop or search of the Lexus, even if the stop and search were illegal.[12] *See id.* at 134, 148–50, 99 S.Ct. 421; *see also United States v. Osorio,* 949 F.2d 38, 40 (2d Cir.1991).

In light of the circumstances of the car stop, however, *see Rakas,* 439 U.S. at 152, 99 S.Ct. 421 (Powell, J., concurring), the Court concludes that the defendant had a legitimate expectation of privacy in the Lexus. Although the defendant did not own the Lexus, she was driving it at the time of the stop. She also had permission to use the car, as indicated by Ms. Little's presence in the car with her. In addition, with the exception of Ms. Little, the defendant had exclusive dominion and control of the Lexus. This conclusion is further supported by the nature of the close personal relationship between the defendant and Ms. Little, which was stronger than an ordinary driver-passenger relationship.[13]

Accordingly, the Court concludes that the defendant had a possessory interest in the car sufficient to create a legitimate expectation of privacy in it. *See United States v. Sanchez,* 635 F.2d 47, 64 (2d Cir.1980), *United States v. Ochs,* 595 F.2d 1247, 1253 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). The Court therefore proceeds to consider the merits of the defendant's suppression motions related to the car stop, as well as her motion concerning the search of 10 Rosewood Avenue. *See Ochs,* 595 F.2d at 1253.

### B. *Probable Cause to Stop the Lexus*

The defendant moved to suppress the two bottles of PCP seized as a result of the car stop and the subsequent search of the Lexus, including a search of her purse, claiming that her rights under the Fourth and Fourteenth Amendments were violated.

 "An ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments.... Accordingly, such stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts." *United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.), *cert. denied,* 513 U.S. 877, 115 S.Ct. 207, 130 L.Ed.2d 136 (1994), *see also Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Probable cause arises when a police officer reasonably believes that an offense has been committed or is being committed. *See Scopo,* 19 F.3d at 781. Furthermore, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "[O]nly the probability, and not a prima facie showing, of criminal activity is the

---

**12.** In its proposed findings of fact and conclusions of law, the government contends that the defendant lacks standing to challenge the car stop or the search of the car. The Court interprets this argument to mean that the defendant's Fourth Amendment rights were not violated by the stop or search of the car.

*See Rakas,* 439 U.S. at 140, 99 S.Ct. 421 (Rehnquist, J., plurality).

**13.** The defendant admits that she and Ms. Little were engaged in a romantic relationship.

standard of probable cause." *Id.* at 235, 103 S.Ct. 2317 (internal quotations omitted).

### 1. Probable Cause to Believe There Was PCP in the Lexus

■ The defendant concedes that the Task Force had reason to believe that Ms. Little was involved in a narcotics transaction on November 13, 1999, and that the Task Force officers had a reasonable suspicion to believe that there might be narcotics in the Lexus at the time of the car stop.[14] The defendant contends, however, that Detectives Cotto and Segarra lacked probable cause to stop the Lexus, which resulted in the seizure of the two bottles of PCP and gave rise to the defendant statements that the bottles contained spiritual oil and that she owned the purse from which the larger bottle was seized. The Court nevertheless concludes that the police officers had probable cause to believe that there were narcotics in the Lexus, and thus probable cause to stop the car on that basis.

The Task Force had extensive information concerning Ms. Little's involvement in selling PCP prior to the car stop on November 13, 1999, both from its own investigation of her and from the DEA's investigation of Mr. Theus in New York. This information included information gathered from reliable confidential informants and from physical and electronic surveillance of Ms. Little and Mr. Theus. It included monitored telephone calls between Ms. Little and Mr. Theus, including the call on the morning of the car stop in which Ms. Little arranged to meet Mr. Theus at the car wash in New York and purchase nine ounces of liquid PCP. The Task Force and the DEA also confirmed the trip to New York and the meeting at the car wash with physical surveillance. Shortly before the car stop, the DEA advised the Task Force that it observed Ms. Little and the defendant meet with Mr. Theus in New York, and that Ms. Little and the defendant were on their way back toward Connecticut in the Lexus. Detectives Cotto and Segarra, who were assigned to the Task Force, intercepted the Lexus as it returned to Connecticut and decided to stop it and search for the nine ounces of PCP.

Based on the totality of these circumstances, *see id.* at 238, 103 S.Ct. 2317, the Court concludes that there was probable cause to suspect that there were narcotics in the Lexus at the time of the stop Detectives Cotto and Segarra, who were involved in the Task Force's PCP investigation of Ms. Little and the surveillance of the Lexus on November 13, 1999, clearly had a reasonable basis for believing that there was PCP in the Lexus at the time they stopped it. *See also, e.g., United States v. Ross,* 456 U.S. 798, 817 & n. 22, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (involving a similar factual situation). The car stop therefore did not violate the Fourth and Fourteenth Amendments.

### 2. Probable Cause to Believe the Lexus Was Speeding

■ Alternatively, the government has presented evidence that the Lexus was speeding at the time it was stopped by Detectives Cotto and Segarra. The defendant does not dispute that speeding is a violation of Connecticut law. *See* Conn. Gen.Stat. § 14–219. The Court also credits Detective Cotto's testimony that the car was speeding at approximately 85 to 90 miles per hour, in violation of Connecticut law. *See id.* The Court therefore con-

---

**14.** The Court concludes that the police officers could have stopped the Lexus solely on the basis of this reasonable suspicion admitted by the defendant. *See Scopo,* 19 F.3d at 781. Stopping the car on the basis of a reasonable suspicion, however, would not have permitted the police officers to search it as fully or thoroughly as a stop based on probable cause. *See Knowles v. Iowa,* 525 U.S. 113, 118–18, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998). In this regard, the defendant appears to dispute whether there was probable cause to stop the Lexus as a way of challenging the scope of the subsequent search of the car. *See infra* Part III.B.

cludes that there was probable cause to stop the Lexus for speeding, regardless of the officers' true motive for the stop or whether the defendant ultimately received a ticket for speeding. *See Scopo,* 19 F.3d at 782 ("When an officer observes a traffic offense-however minor-he has probable cause to stop the driver of the vehicle."); *see also United States v. Dhinsa,* 171 F.3d 721, 725 (2d Cir.1998).

### C. Probable Cause to Search the Lexus

The defendant further contends that, even if there were probable cause to stop the Lexus for speeding or some other traffic violation, such a violation did not justify the scope of the search of the Lexus by Detective Cotto. In support of this contention, the defendant argues that Detective Cotto's search of the Lexus exceeded the scope of what is permitted during a routine traffic stop under the Fourth and Fourteenth Amendments. She also contends that she was entitled to a heightened expectation of privacy in her purse because of its very personal nature, and thus that Detective Cotto was not entitled to search it during the traffic stop. In addition, because the Task Force had no information concerning the defendant or her involvement in criminal activity prior to November 13, 1999, the defendant contends that the search of her purse was not supported by independent probable cause to believe that there were narcotics in it.

### 1. Search Based on Probable Cause to Believe There Was PCP in the Lexus

Although the Court agrees that probable cause to stop a car for speeding does not, without more, justify a full search of the car, *see Knowles,* 525 U.S. at 114, 119 S.Ct. 484, the police officers in this case had probable cause to believe that there was PCP in the Lexus. *See supra* Part III.A.1. Detective Cotto therefore had probable cause to search the Lexus for narcotics, including every part of the Lexus and its contents that might have concealed narcotics. *See Ross,* 456 U.S. at 825, 102 S.Ct. 2157 ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."). Accordingly, because the defendant's purse was found in the car and could have concealed PCP, Detective Cotto had probable cause to search it during the car stop. *See Wyoming v. Houghton,* 526 U.S. 295, 307, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999).[15]

### 2. Search Based on Probable Cause to Believe the Lexus Was Speeding

Even if the police officers initially lacked probable cause to believe that there were narcotics in the Lexus, and thus lacked probable cause to stop the car on any basis other than for speeding, the search of the Lexus, including the search of the defendant's purse, would be permitted under

---

**15.** Even if a woman's purse found in a car during a search for narcotics might warrant a heightened expectation of privacy, and thus greater protection under the Fourth and Fourteenth Amendments, the mere fact that a container is a purse does not alter the conclusion that a search supported by probable cause extends to a search of all containers capable of concealing the object of the search. *See Houghton,* 526 U.S. at 308, 119 S.Ct. 1297 (Breyer, J., concurring). Consequently, as in this case, where the defendant's purse was located under a seat in the Lexus and was not attached to her person, it would not warrant greater protection under the Fourth and Fourteenth Amendments. *See id.*

Nor does the fact that Detective Cotto searched the purse at two separate times during the encounter alter the conclusion that the search was constitutionally permissible. Because Ms. Little denied ownership of the Lexus and stated that the purse did not belong to her or to the defendant, and thus because it was still necessary to identify the purse's owner, the Court concludes that the second examination of the purse by Detective Cotto was merely a continuation of the initial examination. *Cf., e.g., United States v. Huslage,* 480 F.Supp. 870, 875 (W.D.Pa.1979) (citing several appellate court decisions).

the "plain view" exception to the Fourth and Fourteenth Amendments.

■■■■ "The plain view doctrine is a well-recognized exception to the Fourth Amendment warrant requirement." *Ruggiero v. Krzeminski,* 928 F.2d 558, 561 (2d Cir.1991) (internal quotation marks omitted). "The plain view exception to the warrant requirement authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Scopo,* 19 F.3d at 782 (internal quotation omitted). "Under this exception to the Fourth Amendment warrant requirement, a police officer may seize evidence when in plain view if: (1) the officer's initial intrusion was permissible under the Fourth Amendment; (2) the discovery of evidence is inadvertent; and (3) the nature of the evidence found is immediately apparent." *Id.* (internal quotation marks omitted).

■■■■ Detectives Cotto and Segarra had independent probable cause to stop the Lexus for speeding. *See supra* Part III. A.2. As they approached the Lexus, they also observed the defendant in the driver's seat and Ms. Little in the front passenger seat. Neither the defendant nor Ms. Little was wearing a seatbelt, which was also a violation of Connecticut law. *See* Conn. Gen.Stat. § 14–100a. It was therefore constitutionally permissible for the detectives to request the car's registration, which Detective Cotto did while standing next to the Lexus. *See United States v. Boucher,* 909 F.2d 1170, 1173 (8th Cir.), *cert. denied,* 498 U.S. 942, 111 S.Ct. 350, 112 L.Ed.2d 314 (1990) (citing *Commonwealth of Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)).

■■■■ When Detective Cotto asked Ms. Little for the vehicle's registration and insurance card so that Detective Segarra could prepare an infraction for driving without a seatbelt, she opened the glove box. As she did so, Detective Cotto observed a small bottle roll forward. In addition, as the bottle rolled forward in the glove box, Ms. Little attempted to cover it with her left hand while handing the registration and insurance information to the detective with her right hand. As indicated, Detective Cotto recognized the bottle as matching a description previously provided by the DEA in New York of the ounce-size packages of PCP sold by Mr. Theus. He also saw that the clear-glass bottle contained a yellow-brown liquid substance consistent with the color of liquid PCP. The Court concludes from this evidence that Detective Cotto observed the bottle from outside the car, his observation was an inadvertent result of the vehicle registration check, and the illegal nature of the bottle was immediate apparent to him. Consequently, because the bottle of PCP was in plain view, neither its observation or its subsequent seizure involved any invasion of privacy warranting suppression. *See Horton v. California,* 496 U.S. 128, 133, 141, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

■■■■ Once Detective Cotto placed Ms. Little in the back of the police cruiser with the defendant and returned to the Lexus, he further confirmed that it was PCP by opening the bottle and smelling its contents. By this point, Detective Cotto also had probable cause to believe that there were narcotics in the Lexus. Accordingly, he had probable cause to search the Lexus more fully, including probable cause to move the seat forward, which he did. *See Ross,* 456 U.S. at 825, 102 S.Ct. 2157. Furthermore, once Detective Cotto moved the seat forward, he observed the second, larger bottle of PCP in the top of the defendant's purse, which the Court also concludes was in plain view at that point.

## D. Statements by the Defendant

As there was no violation of the Fourth Amendment resulting from the stop or search of the Lexus, including a search of

the defendant's purse, the defendant's statements to Detectives Cotto and Segarra that the bottles contained spiritual oil and that she owned the purse from which the larger bottle was seized were not fruits of an unlawful search and seizure, which must be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 484–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, the defendant also contends that her statements to the police officers during the car stop constitute a violation of her rights under the Fifth and Fourteenth Amendments.

Although the parties agree that the defendant and Ms. Little were not placed under arrest during the car stop, the defendant contends that she was questioned by the detectives concerning the substance in the bottles seized from the car and ownership of her purse in violation of her Fifth Amendment rights against compelled self-incrimination. While there is no dispute that the defendant did not receive *Miranda* warnings prior to being questioned concerning the substance in the seized bottles or prior to indicating that she owned the purse, the Court concludes that the defendant was not in custody for the purpose of requiring *Miranda* warnings under the Fifth Amendment. *See Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (discussing the constitutional rule announced in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

 "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *State of Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The relevant inquiry in determining whether a suspect is "in custody" at a particular time is how a reasonable person in the suspect's position would have understood the situation. *See Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). While acknowledging that few motorists would feel free to disobey a police

officer during a traffic stop, the Supreme Court has nevertheless determined that a car stop does not automatically render a suspect "in custody" for the purpose of requiring *Miranda* warnings. *See id.* at 436–37, 86 S.Ct. 1602. A motorist instead must show that he or she was subject to restraints comparable to those associated with a formal arrest, which restraints are not present in a typical, public traffic stop that lasts for a brief period of time. *See id.* at 437–39, 441.

1. Statements Concerning the Substance in the Bottles

 In this case, Detective Cotto told the defendant and Ms. Little that they had been stopped for speeding. He asked the defendant to leave the Lexus and sit in the back of the police cruiser while Detective Segarra prepared an infraction for driving without a seatbelt. Although Detective Cotto patted down the defendant and placed her in the police cruiser, he also told her then that she would receive a verbal warning for speeding and indicated that she would be free to leave once the infraction was prepared. In addition, Detective Cotto placed Ms. Little in the back of the police cruiser with the defendant, without making any effort to separate them. When he confronted them with the bottles of PCP, he asked them what the bottles contained and then indicated that he would have them analyzed at the laboratory. However, at no time did Detective Cotto or Detective Segarra mention the PCP investigation or their suspicions that the bottles contained PCP. Detective Cotto also reiterated that neither of them would be placed under arrest at that time.

In light of these circumstances, the Court concludes that the encounter was not so "police dominated" as to rise to the level of a custodial interrogation. *See id.* at 439, 86 S.Ct. 1602. Although the defendant may have been apprehensive during the encounter, particularly when confronted with the bottles of PCP and questioned about their contents, at no time was she

arrested or threatened with arrest. Rather, the defendant was told that she would not be arrested.

Furthermore, because Detective Cotto explained that the defendant would receive an infraction and indicated that she would then be free to leave, his patting her down and placing her in the police cruiser was, from an objective viewpoint, insufficient to convey the message that she was not free to leave. *See Nova v. Bartlett,* 63 F.Supp.2d 449, 452–53 (S.D.N.Y.1999), *aff'd,* 211 F.3d 705 (2d Cir.2000). The fact that Detective Cotto presented the defendant with the bottles of PCP also was insufficient to escalate the encounter into a custodial interrogation, particularly because the defendant was not aware of PCP investigation, Detective Cotto's role in such an investigation, or his suspicions concerning PCP in the bottles. *Cf., e.g., id.* at 454–57; *United States v. Murray,* 89 F.3d 459, 461 (7th Cir.1996) (involving a police officer showing the defendant a firearm and questioning him about it while in the back of a squad car); *Boucher,* 909 F.2d at 1174 (involving a police officer's unrevealed suspicions concerning a concealed firearm). In addition, the encounter occurred on a public thoroughfare and lasted approximately ten minutes, which confirms that there was no custodial interrogation. *Cf., e.g., Berkemer,* 468 U.S. at 441–42, 104 S.Ct. 3138; *United States v. Wong,* 867 F.2d 754, 756 (2d Cir.1989); *Nova,* 63 F.Supp.2d at 454–57.

### 2. Statement Concerning Ownership of the Purse

 The Court also concludes that, even if the defendant were in custody while in the police cruiser, she was not in custody for the purpose of requiring *Miranda* warnings when she indicated to Detective Cotto that she owned the purse from which the second, larger bottle of

PCP was seized. In addition to the preceding factors, the Court reaches this conclusion based on the fact that, at the time the defendant indicated that she owned the purse, she had received her infraction from Detective Segarra, who explained to her how she should respond to it, and she was no longer in the police cruiser. She was free to leave. She approached Detective Cotto at the Lexus voluntarily and asked him what he was doing with her purse. Accordingly, even if Detective Cotto's actions in searching through the purse were reasonably likely to elicit an incriminating response from the defendant, *see Innis,* 446 U.S. at 301, 100 S.Ct. 1682, she was not subject to restraints comparable to a formal arrest at that time. Nor, absent any evidence of additional compulsion, which the defendant has not offered, would the suppression of any statements by the defendant while she was in the police cruiser require the suppression of her later, otherwise admissible statement concerning ownership of her purse. *See generally Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Her statement concerning ownership of the purse therefore was not compelled in violation of her rights under the Fifth and Fourteenth Amendments, even if her earlier statements were obtained in violation of such rights.[16]

### E. Search Warrant for 10 Rosewood Avenue

Finally, the defendant contends that the search warrant for 10 Rosewood Avenue was not supported by probable cause, was based in part on illegally seized evidence from the car stop, and included false and misleading information in violation of the Fourth and Fourteenth Amendments. However, because the car stop did not result in any violation of the Fourth, Fifth,

---

**16.** To the extent that the defendant also contends her various statements were obtained in violation of her Sixth Amendment right to counsel, the Court concludes that the Sixth Amendment is inapplicable because the defendant had not been charged with any offense related to the subjects of her statements at the time that she made them. *See Illinois v. Perkins,* 496 U.S. 292, 299, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990).

or Fourteenth Amendments, the Court concludes as an initial matter that the search warrant was not based on illegally seized evidence from that encounter.

█ Based on the totality of circumstances surrounding the issuance of the search warrant for 10 Rosewood Avenue, *see Gates,* 462 U.S. at 230, 103 S.Ct. 2317, the Court also concludes that the search warrant was supported by probable cause. Following the car stop on November 13, 1999, which was recounted in the affidavit in support of the search warrant, there was a reasonable basis to believe that the defendant was involved with Ms. Little in selling PCP. The defendant had also been identified as "Kimberly Graham" by the time the warrant was prepared. The warrant affidavit further indicated that the defendant lived at 10 Rosewood Avenue and that the gray Lexus had been seen there previously. It also recounted the events of November 14, 1999. On that date, as indicated, Ms. Little and Mr. Theus spoke again and agreed to meet at the car wash in New York. The DEA in New York advised the Task Force later that day that Ms. Little and the defendant met with Mr. Theus at the car wash and were returning toward Connecticut in a green Mazda. Task Force officers conducted physical surveillance of the Mazda, which they learned was registered to the defendant's mother, as it returned to Connecticut. They followed the Mazda to a residence in New Haven, which they subsequently learned from a reliable confidential informant was used for drug dealing activities, and later observed it parked at the defendant's residence at 10 Rosewood Avenue. Accordingly, based on the information contained in the search warrant affidavit, there was a reasonable basis to believe that 10 Rosewood Avenue might be used for drug dealing activities.[17] *Cf., e.g.,* *United States v. Travisano,* 724 F.2d 341, 346–47 (2d Cir.1983).

Even if the search warrant for 10 Rosewood Avenue lacked probable cause, the defendant has failed to establish that suppression would be an appropriate remedy. The search warrant for 10 Rosewood Avenue was authorized by Senior U.S. District Judge Ellen B. Burns, and thus is entitled to great deference. *See United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Suppression is therefore appropriate only if Judge Burns was misled by knowingly false information in the warrant affidavit, if she wholly abandoned her neutral judicial role, if the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or if the warrant itself was do facially deficient that the executing officers could not reasonably presume it to be valid. *See id.* at 923, 104 S.Ct. 3405. The defendant has presented no evidence in support of such claims, and the Court concludes that none of these justifications for suppression is applicable in this case.

In particular, to the extent that the defendant challenges the veracity of the affidavit in support of the search warrant, the Court concludes that the defendant has offered no basis from which to conclude that the affidavit contained statements of deliberate falsehood or reckless disregard for the truth. *See Franks v. Delaware,* 438 U.S. 154, 155–56, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The defendant has identified no portion of the warrant affidavit that is claimed to be false, or demonstrated that the warrant would lack probable cause without such portions. *See id.* at 171–72, 98 S.Ct. 2674. Nor has she offered sworn affidavits or statements from witnesses-or an explanation for the absence of such evidence-from which to establish that the warrant affidavit relied on by Judge Burns was in any way false. *See id.* Accordingly, under no circum-

---

17. Nor is information in the warrant affidavit from reliable confidential informants concerning other residences used for drug dealing sufficient to alter this conclusion. Such information supplements the probable cause to believe that Ms. Little and the defendant were engaged in a wide-ranging PCP conspiracy.

stances is suppression of the evidence recovered from the search of 10 Rosewood Avenue appropriate in this case.

## IV. Conclusion

For the preceding reasons, the motion to suppress physical evidence [Document # 41], the motion to suppress statements [Document # 45], and the motion to suppress evidence seized from the defendant's residence [Document # 47] are DENIED.